[Nos. A118084, A118452. First Dist., Div. Two. Sept. 23, 2008.]

PATRICIA GRIDLEY et al., Plaintiffs and Appellants, v.
MICHAEL A. GRIDLEY et al., Defendants and Respondents.

[No. A120925. First Dist., Div. Two. Sept. 23, 2008.]

MICHAEL A. GRIDLEY et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
PATRICIA GRIDLEY et al., Real Parties in Interest.

1564

COUNSEL

Livingston Mix, Dennis L. Livingston and Mary E. Mix for Plaintiff and Appellant Christine Bennett.

Law Office of George G. Benetatos and George G. Benetatos for Plaintiff and Appellant and for Real Party in Interest Patricia Gridley.

Kerr & Wagstaffe, James M. Wagstaffe, Keith K. Fong, Holly Hogan; Law Offices of Benjamin R. Winslow and Benjamin R. Winslow for Defendants and Respondents and for Petitioners.

No appearance for Respondent Superior Court.

OPINION

HAERLE, J.—

## I. INTRODUCTION

Elsie N. Gridley (Elsie) died in May 1992 and, more than 15 years later, her family continues to fight over her estate. The backdrop for the present disputes is a March 22, 2006, petition filed by Elsie's daughters, Patricia and Christine, against their brothers, Michael and Robert, and others, alleging

fraud and other wrongdoing in connection with the sale of a substantial real property asset from Elsie's trust estate which is referred to by the parties as the Dixon Ranch (the Dixon Ranch petition).[1] The parties before us disagree as to whether the Dixon Ranch petition should be decided by the Honorable John Dearman, before whom it is now pending, or by the Honorable Harry T. Low, a retired justice of the Court of Appeal, who is now employed by a private mediation and arbitration service, and who was appointed a temporary judge in this case in 1994.

This and related issues reach us via three separate actions which we have consolidated. Patricia and Christine (jointly appellants) have filed two appeals from orders pursuant to which Justice Low made rulings affecting resolution of the Dixon Ranch petition. Then, after Judge Dearman filed orders consolidating the entire dispute before him, Michael, Robert, Benjamin Winslow, Ed Flynn, Larry Kennings and Wetland Resources, LLC (jointly respondents), filed a petition for writ of mandate in this court pursuant to which they seek an order compelling Judge Dearman to vacate his orders and to confirm that all matters pending in Elsie's trust estate case are to be decided by Justice Low.

We reverse the orders appealed from and deny the petition for a writ of mandate.

## II. STATEMENT OF FACTS

### A. *Background: Probate Administration*

Elsie died testate on May 21, 1992. Her will, which was admitted to probate on September 8, 1992, provided that her property was to be divided equally among her four children, Michael, Robert, Christine and Patricia. Michael was appointed executor of Elsie's probate estate. Shortly thereafter, Arnold, Elsie's husband and the father of her four children, attempted to exercise a right of survivorship with respect to most of Elsie's assets. The estate responded by attempting to enforce an agreement between Elsie and Arnold that all assets acquired during their marriage were community property. Arnold and his children attempted to resolve this dispute by entering into a settlement agreement in August 1993 (the August 1993 settlement agreement).

---

[1] For clarity, we will refer to individual members of Elsie's family by their first names.

The August 1993 settlement agreement provided, among other things, that all property owned by Elsie and/or Arnold at the time of Elsie's death was community property with the exception of one piece of real property that was designated as Arnold's separate property. The agreement also called for the establishment of the Elsie N. Gridley Irrevocable Trust (the ENGIT) and provided that Michael and Arnold would serve as cotrustees. The ENGIT would hold within it two separate share trusts, the Elsie Trust and the Arnold Trust. The Elsie Trust would hold most of Elsie's share of the community property and would "provide for income for life" to Arnold with the remainder to be distributed upon his death to the children.

Paragraph 9 of the August 1993 settlement agreement stated, in part, that "[e]ach person who signs this document represents and warrants that such person is duly authorized and qualified to so sign on behalf of the persons and/or entities intended to be bound hereby." Paragraph 10 further stated "Each party hereto has been represented by counsel throughout the process of negotiating the settlement characterized herein . . . ."

The August 1993 settlement agreement was signed by Arnold, Michael, Robert, Patricia and Christine. The agreement was also signed by Arnold's attorney of record and by respondent Benjamin R. Winslow (Winslow). Winslow signed the August 1993 settlement agreement in his capacity as "Attorney for Michael A. Gridley, Robert J. Gridley, Patricia A. Gridley and Christine Bennett."

On August 6, 1993, Michael, as executor of Elsie's probate estate, and Arnold executed the ENGIT trust agreement. Michael and his father, Arnold, were named as cotrustees. Paragraph 1.7 of the ENGIT, entitled "Purpose of Trust," stated: "This Trust is created pursuant to an agreement to settle the litigation in the Estate of Elsie N. Gridley Case No. 259147 San Francisco Superior Court. The terms of that agreement are incorporated herein (Exhibit A.) and shall govern the interpretation of the terms and conditions of this trust by the Probate Court and the trustees. This Trust shall remain subject to the jurisdiction of the Probate Court during its entire term."

The August 1993 settlement led to numerous additional disputes among the members of Elsie's family. On July 19, 1994, the Honorable Isabella T. Grant filed a second interim order enforcing the terms of the settlement agreement. That order stated, among other things: "The parties have elected to use Endispute, a Judicial Arbitration and Mediation organization, to resolve all

administrative and interpretive issues related to the implementation of the Settlement Agreement . . . . The parties agree that the Endispute Judge selected shall have all the powers of a Superior Court Judge acting in a Probate capacity. All decisions of the Judge are binding on the parties. The Judge will have authority to determine all matters related to the administration of this estate except for approval of the final distribution of the estate."

On July 26, 1994, Michael, as executor of Elsie's estate, and Arnold entered into a stipulation that the Honorable Harry Low, a retired Justice of the California Court of Appeal, First Appellate District, would be appointed as a temporary judge. The stipulation, which identified the "parties to this cause" as "Michael Gridley, Executor" and "Arnold S. Gridley," contained the following description of the issues to be submitted to Justice Low: "All issues necessary for a complete determination of the cause, as determined by the pleadings on file and which are then at issue, Judge Grant's Order assigning this matter to J.A.M.S. [formerly Endispute], together with such additional issues as the parties, from time to time, may stipulate to be heard and adjudicated by the Temporary Judge, but not to include final distribution and final accounting."

Justice Low consented to act as temporary judge on August 10, 1994, and Judge Grant approved the parties' stipulation and filed an order designating Justice Low as temporary judge on August 26, 1994.

During the following 18 months, Justice Low conducted a total of 16 hearings and four family meetings with the beneficiaries of Elsie's probate estate in order to enforce the August 1993 settlement agreement. Among other things, Justice Low facilitated the required division of assets between Arnold and his trust, on the one hand, and the Elsie Trust on the other hand. For example, Arnold and the estate entered into an agreement that permitted Arnold to purchase the estate's 50 percent interest in a family cable car company. As later described by Justice Low, this agreement required the parties to amend the August 1993 settlement documents to provide that Michael would serve as sole trustee of the ENGIT and that Arnold would have sole ownership and management authority over the cable car company.

As best we can determine from the evidence before us, an amendment to the August 1993 settlement agreement was drafted but not executed by all of the parties.[2] A document entitled "Amendment To Mutual Settlement and

---

[2] Respondents' assurance that all the parties signed this agreement is not evidence.

While we are on the subject of the evidence before us, we note that appellants take the position that documents and pleadings that were filed with Justice Low are not part of this record unless they were also contemporaneously filed in the superior court. It is too late in the game to raise this complaint particularly in light of appellants' decision not to provide a clerk's

Release" purports to amend various provisions of the August 1993 settlement agreement to provide that Michael will serve as the sole trustee of the ENGIT. This document also contains the following provision: "The ENGIT Trust shall be amended and restated to include the above changes and to provide the Trustee the election of jurisdiction of the Probate Court or Judicial Arbitration and Mediation Services, Inc. for the interpretation and enforcement of this agreement." Between January and February 1995, Robert, Patricia and Michael signed this document. However, the Amendment was not signed by Arnold, Christine or the parties' attorneys. An empty signature line for Winslow identifies him as the "Attorney for Michael A. Gridley, Robert J. Gridley, Patricia A. Gridley and Christine Bennett."

On February 8, 1995, Michael and Arnold executed an amended ENGIT trust agreement. According to this agreement, Michael would serve as trustee. The purpose of the trust, as set forth in paragraph 1.7, was as follows: "This Trust is created pursuant to an agreement to settle the litigation in the Estate of Elsie N. Gridley Case No. 259147 San Francisco Superior Court. The terms of that agreement (as amended) are incorporated herein (Exhibit A.) and shall govern the interpretation of the terms and conditions of this trust by the Probate Court and the trustees. This Trust shall remain subject to the jurisdiction of the Probate Court during its entire term. The trustee, at his election, may select the Probate Court or Judicial Arbitration and Mediation Services, Inc. for the interpretation and enforcement of this agreement."

In a report dated February 28, 1996, Justice Low advised Judge Grant that he had completed his assignment and was transferring the case back to her along with his recommendations so that she could review and rule on the final distribution of Elsie's probate estate. In his report, Justice Low acknowledged that there were "portions of the proceedings" during which Christine, Patricia and Robert were not separately represented by counsel. Justice Low advised that he attempted to keep these beneficiaries informed about the issues and, in later portions of the proceedings, Christine and Patricia actively participated in hearings and family meetings. On March 1, 1996, Justice Low filed his order formally transferring this case to Judge Grant for approval of the final accounting and final distribution of Elsie's probate estate.

On March 18, 1996, Christine and Patricia filed objections to Michael's final probate account and report and to Justice Low's recommendations

---

transcript. As a result of that decision, the parties have filed dozens of volumes of appendices. We simply are not in a position to determine which of the thousands of documents that the parties have filed in this court were properly filed in the court below.

pertaining thereto. Among other things, appellants argued that Michael should not be appointed trustee of Elsie's trust estate because he lacked the requisite experience and because of hostility and poor communication between family members. Christine and Patricia also objected to a recommendation Justice Low had made to Judge Grant that "all matters affecting the Trust be referred to him for resolution." Appellants stated: "The beneficiaries believe that these issues are better handled by the Probate Court and all matters should now be addressed directly to the Probate Court rather than to Judge Low. Aside from the obvious cost factor involved in this, given the arduous and lengthy administration of this estate, it is in the best interests of all parties to have a fresh, objective viewpoint on issues which may arise . . . in the future concerning the administration of the trust. For these reasons, it is requested that all matters by and between the trust and the beneficiaries be resolved by recourse directly to this court."

On April 23, 1996, Judge Grant filed her order settling Michael's final account and report. The court ordered, among other things, that administration of the probate estate was brought to a close and that Michael's final account as executor was settled, allowed and approved. The order also stated that Michael was appointed as the trustee of the ENGIT as amended and that Elsie's estate was to be distributed to Michael as trustee of the ENGIT. The final paragraph of the order stated that "[t]he Probate Court shall continue to have jurisdiction over the administration of the residuary trust . . . ."

Arnold appealed Judge Grant's April 23, 1996, order, contending that Michael's final account should not have been approved for various reasons and that the court abused its discretion by denying his request to reform the August 1993 settlement agreement to reflect the parties' alleged "true" intent. This court rejected all of Arnold's contentions and affirmed the April 23, 1996, order in an unpublished opinion filed November 5, 1997. (*Estate of Gridley* (Nov. 5, 1997, A074510) [nonpub. opn.].)

On June 3, 1998, the Honorable Lawrence D. Kay filed an order approving Michael's supplemental accountings for the probate estate covering the period from January 1, 1996, through December 31, 1997.[3] The order further stated that Elsie's estate "is distributed to Michael A. Gridley, Trustee of the Elsie N. Gridley Irrevocable Trust pursuant to the terms of the order of final distribution dated April 22, 1996."

---

[3] On September 10, 1998, Justice Low approved Michael's third supplemental accounting for the probate estate for the period from January 1, 1998, to May 31, 1998.

B. *Trust Estate Administration and the Present Disputes*

As noted above, both the August 1993 settlement agreement and the ENGIT trust agreement contemplated that Elsie's trust would be distributed after Arnold's death. Arnold died on May 8, 2004. More than four years later, the trust estate remains open.

### 1. *Michael's Trust Accountings*

Michael has prepared seven accountings pertaining to his administration of Elsie's trust estate from June 1, 1998, through December 31, 2004. His petitions seeking approval of these accountings were all presented to Justice Low. Although it is not clear from the record before us, it appears that Michael did not file—or belatedly filed—at least some of his accounting petitions and supporting documentation.

Michael's first trust accounting covered the period from June 1, 1998, through December 31, 1999. In an order signed September 14, 2000, Justice Low approved Michael's first trust accounting, noting that no objections had been filed. Both the accounting and the September 14, 2000, order approving it were not filed until May 17, 2004. On March 12, 2004, Michael signed a petition seeking approval of his second, third, fourth and fifth trust accountings covering the period from January 1, 2000, through December 31, 2003.

On April 14, 2004, Elsie's children entered into a stipulation pursuant to which each agreed to approve Michael's second, third, fourth and fifth trust accountings without waiving their rights to object to or otherwise challenge the sales of real property or the appropriateness of expenditures relating to such sales during the relevant accounting periods. This stipulation was signed by Christine's attorney, Dennis Livingston, Patricia's attorney, George Benetatos, and by Winslow who was identified as the attorney for Michael as trustee and Michael and Robert as individuals.

In an order filed May 17, 2004, Justice Low approved Michael's second, third, fourth and fifth trust accountings subject to the April 14 stipulation that sales of real property assets and related expenditures that occurred during these accounting periods would be subject to further review. Michael's sixth trust accounting, for the period from January 1, 2004, through May 8, 2004, and Justice Low's order approving this accounting subject to the parties' April 14 stipulation were both filed on November 18, 2004.

On August 18, 2006, Michael, through his counsel, submitted to Justice Low a petition for approval of his seventh trust accounting covering the period from May 9, 2004, through December 31, 2004. Although there is

evidence this petition was mailed to appellants, the record does not show that the petition was ever filed with the court.

### 2. *The Dixon Ranch*

According to Michael's petition for approval of his second through fifth trust accountings, on March 7, 2003, the trust estate sold the Dixon Ranch, a 1,836 acre property located in Dixon, California. The Dixon Ranch was sold for $1,580,000, resulting in a reported loss to the trust estate of $497,705. According to Michael's petition, the sale price value was established by an MAI appraisal, while the (higher) inventory value had been set at $1,000 per acre without an appraisal.

Although not disclosed in Michael's relevant trust accounting or petition, the Dixon Ranch was sold to Michael and Robert. On March 7, 2003, Michael signed a note promising that he and Robert would pay Elsie's trust estate $1,580,000, with interest at a rate of 4 percent. This note was secured by a deed of trust on the Dixon Ranch. The actual conveyance of the Dixon Ranch from the trust to Michael and Robert was accomplished by a grant deed executed by Michael as trustee on March 10, 2003. That same day, Michael and Robert executed another grant deed pursuant to which they conveyed the Dixon Ranch to Wetland Resources, LLC.

Wetland Resources was established for the purpose of organizing and operating the " 'Elsie Gridley Mitigation Bank' and activities related to that bank." According to a March 3, 2003, operating agreement, this company has two categories of members, A and B members. A members are voting members with management authority, while B members may only vote with regard to certain specified matters. The A members of Wetland Resources are Michael, Winslow, Ed Flynn, Larry Kennings and Mark Eichstaedt. The B members are Robert and Michael, as trustee of the Michael Gridley Revocable Trust. According to the operating agreement, the respective "interest in profit" of each member is: Winslow—18 percent, Michael—12 percent, Flynn—12 percent, Kennings—6 percent, Eichstaedt—2 percent, Michael as trustee of his revocable trust—25 percent, and Robert—25 percent.

On March 22, 2006, Patricia and Christine filed the Dixon Ranch petition in San Francisco Superior Court; in it they alleged causes of action against Michael, Robert, Winslow, Flynn, Kennings and Wetland Resources. Petitioners alleged that, in 1980, Arnold and Elsie learned that the Dixon Ranch likely qualified as a national natural landmark and that both the state and federal governments were interested in the property. Petitioners further alleged that Michael had known about the Dixon Ranch property's potential since approximately 1980 but that he never shared that information

with his sisters, although he did advise Winslow of the property's potential. Furthermore, Michael allegedly provided petitioners with vague, inaccurate and incomplete information regarding a proposal to develop the Dixon Ranch and obtain for it the designation of a "Mitigation Bank Property."

Petitioners further alleged that, in 2001, Michael obtained an appraisal of the Dixon Ranch which was based on erroneous and incomplete information and resulted in an undervaluation of the property. Also in 2001, Michael allegedly hired respondents Flynn and Kennings to perform consulting work in connection with the Dixon Ranch and its suitability to qualify as a "Mitigation Bank Property," and paid them excessive consulting fees. Petitioners further alleged that Michael and the other respondents engaged in a series of wrongdoings pursuant to which the Dixon Ranch was transferred to Michael and Robert and then to Wetland Resources.[4]

The Dixon Ranch petition alleges causes of action for (1) breach of fiduciary duties and duty of loyalty, (2) breach of trust [against Michael and Winslow], (3) rescission, (4) quiet title, (5) conversion, (6) immediate suspension and removal of trustee [against Michael], (7) imposition of constructive trust, (8) fraud [against Michael and Winslow], (9) constructive fraud, (10) attorney malpractice [against Winslow], (11) gross negligence, (12) conspiracy, (13) disqualification of Winslow, (14) surcharge, and (15) attorney fees and costs.

### 3. *Dispute Regarding Justice Low's Authority*

A hearing on the Dixon Ranch petition was scheduled for May 2, 2006, in the probate department of the superior court. Respondents moved to continue that hearing on the ground that many of the matters covered by the petition were already pending before Justice Low and that Patricia and Christine were improperly attempting to evade Justice Low's jurisdiction.

On May 16, 2006, Justice Low signed an order entitled "Order Re Continuing Authority." The order stated in part: "the temporary judge has continuing authority to hear and determine the matter of the approval of the accounting of Elsie N. Gridley until its final determination. The Court recognizes that there is a pending petition which brings in possibly new parties, specifically the legal malpractice client, and the bringing in of two

---

[4] Although most of the allegations and causes of action in the petition relate to the sale of the Dixon Ranch, Patricia and Christine also objected to the sale of another trust asset known as the Winters Ranch. On September 21, 2004, Michael sold the 80-acre Winters Ranch for $1.1 million. In their petition, Patricia and Christine alleged that Michael and Winslow breached their duties and violated the Uniform Prudent Investor Act (Prob. Code, § 16045 et seq.) by selling this property for at least $3 million less than its fair market value.

additional parties to the action. The Court reserves determination whether those should be severed and returned to the Superior Court."

On June 29, 2006, Judge Dearman filed an "Order Re Authority To Hear Matters Set Forth in Petition." The order reflects that Judge Dearman conducted a hearing on the Dixon Ranch petition on May 2 and May 17, 2006, reviewed the pleadings, heard argument and then issued the following orders: "1. The request of petitioners that the Probate Court hear the matters set forth in the petition is denied to the extent more fully set forth below. [¶] 2. The matter is returned to Justice Harry Low to hear those matters in which he decides he has authority to hear. [¶] 3. In the event Justice Low finds that there are issues upon which he has no authority to decide, those matters shall be sent back to be heard by the Probate Court. [¶] 4. Petitioners shall present a motion of points and authorities to Justice Low setting forth the issues in the petition discovery which shall be required and an estimate regarding the amount of time to hear such matters and Justice Low shall first hear such motion to determine those issues prior to proceeding with hearing substantive issues in connection with the causes of action set forth in the petition. [¶] 5. Following a hearing on the motion set forth in item 4 above, Justice Low shall make a decision regarding which of those issues are within the scope of his original assignment and which are new matters that should be returned to the Probate Court."

On July 18, 2006, Patricia and Christine filed an appeal from Justice Low's May 16, 2006, order and Judge Dearman's June 29, 2006, order, maintaining, among other things, that Justice Low did not have authority to decide the Dixon Ranch petition. (*Estate of Gridley* (Oct. 17, 2006, A114923) [nonpub. opn.] (the 2006 appeal).) Respondents moved to dismiss the 2006 appeal, arguing that the appealed orders were interlocutory orders and were not among the orders made appealable by the Probate Code. This court granted the motion to dismiss the 2006 appeal on the ground that "neither the order of Judge Dearman nor the order of Justice Low was a 'final order.' " (*Ibid.*)

### 4. *The Motion to Disqualify Winslow*

On January 23, 2007, Patricia filed a motion to disqualify Winslow as attorney for respondents in the Dixon Ranch petition, in which Christine joined. Patricia and Christine argued, among other things, that Winslow had an irreconcilable conflict because he had previously represented them in this action and because of his ongoing fiduciary obligations to them as beneficiaries of Elsie's trust estate.

On February 14, 2007, Justice Low conducted a hearing at the conclusion of which he denied the motion to disqualify Winslow. Justice Low found,

among other things, that there was no attorney-client relationship between Winslow and Patricia and Christine, that Winslow's signature on the 1993 settlement agreement indicating that he represented the four beneficiaries was "in error and was inadvertent," and that there was no showing of an irreconcilable conflict of interest between petitioners and Winslow "from the record that we now have." Justice Low asked Winslow to draft an order denying the motion to disqualify him.

On February 20, 2007, Justice Low signed an order staying various matters before him, including Michael's petitions for approval of his trust accountings, pending his ruling regarding the scope of his authority to decide the Dixon Ranch petition. The last sentence of this order stated: "The Motion to Disqualify Benjamin R. Winslow was heard and denied on February 14, 2007."

On March 8, 2007, Justice Low signed the order denying the motion to disqualify Winslow that Winslow himself had prepared. That order set forth the following "findings" of fact: "1. Ben Winslow did not represent Patricia Gridley or Christine Bennett in 1993 or 1994. [¶] 2. There is no attorney-client relationship between Ben Winslow and Patricia Gridley and Christine Bennett. [¶] 3. At the time of the settlement agreement of August 1993, Christine Bennett was not represented by . . . Ben Winslow. [¶] 4. The signature of Ben Winslow on the August 1993 settlement agreement that he represented the four beneficiaries was in error and was inadvertent. [¶] 5. The statement made by Ben Winslow at a hearing before this Court on May 15, 2006, when Ben Winslow stated that he represented Christine Bennett and Pat Gridley regarding a stipulation was in error. His argument was not evidence. [¶] 6. I find that there is no irreconcilable conflict of interest between Petitioners and Ben Winslow from the record that we now have. [¶] (a) Mike Gridley satisfied his duty to disclose material facts to the beneficiaries of the trust in selling the Dixon Ranch from what I have seen so far. [¶] (b) From the record we now have, the Petitioners declined to buy any part of the Dixon Ranch, and they were adequately informed. [¶] (c) There is no substantial evidence of Ben Winslow's concealment of his participation or failure to disclose so as to constitute a conflict of interest."

On April 3, 2007, Justice Low heard Patricia and Christine's motion for reconsideration of the order denying their motion to disqualify Winslow. Appellants relied on allegedly recently discovered evidence including (1) an unexecuted 1993 letter agreement prepared by Winslow offering legal representation to Christine, Patricia, Michael and Robert, and (2) the partially executed 1995 "Amendment" to the August 1993 settlement agreement, which identified Winslow as the attorney for all of Elsie's children. Justice Low denied the motion for reconsideration, finding, among other things, that

the allegedly new evidence could have been discovered earlier and that, in any event, it did not "show . . . that Ben Winslow was the attorney for Petitioners."

On May 8, 2007, Patricia and Christine filed a notice of appeal from Justice Low's February 20, March 8, and April 18, 2007, orders denying their motion to disqualify Winslow.

### 5. *Justice Low's April 2007 Order*

On February 5, 2007, Patricia and Christine filed a petition under Probate Code section 17200, subdivision (b), pursuant to which they sought instructions from the probate court regarding whether Justice Low had authority to decide various disputes in this case including, in particular, the Dixon Ranch petition.

An "Order in Response to Judge Dearman's Order of June 29, 2006" was drafted by Winslow, signed by Justice Low on April 18, 2007, and filed on April 20, 2007 (the April 2007 order). The April 2007 order stated that Justice Low had reviewed and considered appellants' Probate Code section 17200 petition. However, the order also stated that Justice Low was issuing the present order in response to Judge Dearman's June 29, 2006, order and not to Patricia and Christine's February 5, 2007, section 17200 petition for instructions.

The April 2007 order stated, in part: "The Court has authority to hear and determine issues concerning the Estate of Elsie N. Gridley until a final and complete determination. This includes issues necessary to complete the determination directly affecting the estate, save the final distribution and final accounting. This authority is based on the original stipulation and order dated August 26, 1994 as well as the authority of the amended trust instrument."

In the April 2007 order, Justice Low found that most of the causes of action in the Dixon Ranch petition related to the administration of Elsie's estate and that he had authority to decide them. Specifically, Justice Low determined that he had authority to hear and would hear the following causes of action: (1) breach of fiduciary duties and duty of loyalty; (2) breach of trust (against Michael and Winslow); (3) rescission; (4) quiet title; (5) conversion; (6) immediate suspension and removal of trustee (against Michael); (7) imposition of constructive trust; (11) gross negligence; (13) disqualification of Winslow; (14) surcharge; (15) attorney fees and costs.

Justice Low found that the following causes of action "tend[ed] to allege new matters outside the scope of the original stipulation and order" and

would be returned to the superior court: (8) fraud (against Michael and Winslow); (9) constructive fraud; (10) attorney malpractice; (12) conspiracy.

On June 19, 2007, Patricia and Christine filed a notice of appeal from Justice Low's April 2007 order.

### 6. *Judge Dearman's Consolidation Orders*

On May 9, 2007, Patricia and Christine filed a motion to consolidate the causes of action in the Dixon Ranch petition that were pending before Justice Low with the causes of action in the Dixon Ranch petition that were pending in the probate department of the superior court. They argued, among other things, that their claims, though now pending in two forums, involved common issues of law and fact, and that they could not afford to pay the attorney fees and other costs to try the same case twice.

On August 8, 2007, Judge Dearman signed and filed an order granting the motion to consolidate. In an order signed December 5, 2007, the court denied respondents' motion for reconsideration of the order granting consolidation.

On November 9 and December 20, 2007, Justice Low conducted status conferences regarding Michael's pending petitions for approval of his second through seventh trust accountings. The trial on the petitions was scheduled to commence March 10, 2008.

On January 8, 2008, Patricia filed a motion to stay the March 10, 2008, hearing scheduled by Justice Low to resolve pending issues pertaining to Michael's trust accountings. Patricia further moved for an order consolidating Michael's petitions for approval of his trust accountings with the Dixon Ranch petition pending before Judge Dearman.

On January 18, 2008, Judge Dearman filed an order granting the motions to stay the March 10, 2008, hearing and to consolidate the trust accounting petitions with the Dixon Ranch petition.

On March 17, 2008, respondents filed a petition for writ of mandate in this court pursuant to which they seek an order compelling Judge Dearman to vacate his August 8, 2008, consolidation order, and his January 18, 2008, order staying the hearing before Justice Low and consolidating the trust accounting petitions with the Dixon Ranch petition.

---

## III. DISCUSSION

### A. *Justice Low's Authority*

As noted in our introduction, we have consolidated appellants' two appeals and respondents' writ petition. The common thread is the parties' long-standing disagreement regarding Justice Low's authority to adjudicate the Dixon Ranch petition. We will first pull that thread and then turn to the specific orders presented to us for review.

#### 1. *Appellants Are Not Barred from Challenging Justice Low's Authority*

Respondents contend that this court's decision dismissing the 2006 appeal bars appellants from challenging Justice Low's authority to decide any matter relating to the Dixon Ranch petition until final resolution of that petition. Respondents are mistaken. We did not reach the merits of the 2006 appeal, including the challenge to Justice Low's authority, because appellants erroneously appealed nonappealable orders. Here, by contrast, respondents do not dispute that the order denying the motion to disqualify Winslow is an appealable order. (See *Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 218 [58 Cal.Rptr.3d 275] ["An order denying a disqualification motion is appealable either as an order refusing to grant an injunction to restrain counsel from participating in the case [citation] or as a final order on a collateral matter [citation]."].) Therefore, the challenge to Justice Low's authority is now squarely before us.

Respondents correctly observe that this court declined to treat appellants' 2006 appeal as a writ petition. (*Estate of Gridley, supra,* A114923.) They err, however, by misconstruing our stated reason for declining to find extraordinary circumstances at that time as a substantive ruling with future preclusive effect. We never held—or intimated in any way—that appellants were precluded from challenging Justice Low's authority in the context of a properly filed appeal such as that presented to us here.

#### 2. *Appellants Stipulated to Justice Low's Appointment*

We find that Justice Low was properly appointed a temporary judge in this case pursuant to article VI, section 21, of the California Constitution which states: "On stipulation of the parties litigant the court may order a cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause."

The evidence before us establishes that, in 1994, Arnold, Michael, Robert, Patricia and Christine entered into a stipulation for the appointment of Justice

Low to serve as a temporary judge (the 1994 stipulation). Judge Grant expressly referenced the 1994 stipulation in her July 19, 1994, order. That order stated that the parties to the August 1993 settlement agreement had agreed to the appointment of a private judge in order to resolve issues relating to the implementation of the settlement and also agreed that the temporary judge would have authority to "determine all matters related to the administration of this estate except for approval of the final distribution of the estate." On July 26, 1994, a week after Judge Grant described the 1994 stipulation in her July 19 order, Michael and Arnold executed a written stipulation for the temporary appointment of Justice Low. The stipulation was approved by Judge Grant and incorporated into her August 26, 1994, order formally appointing Justice Low to serve as a temporary judge.

■ Appellants contend they are not parties to the 1994 stipulation because they did not sign the July 26, 1994, agreement. Rule 2.831(a) of the California Rules of Court (rule 2.831) provides that a stipulation for the appointment of a temporary judge "must be in writing" and must be submitted "for approval to the presiding judge or the judge designated by the presiding judge."[5] This rule does not expressly require that the written stipulation be signed by all of the parties and appellants do not explain why, under the circumstances, Michael lacked authority to sign the petition on appellants' behalf. In any event, even if we were to accept that the absence of appellants' signatures violates rule 2.831, that fact would not be determinative because the requirements imposed by this Rule of Court are not jurisdictional. (*In re Richard S.* (1991) 54 Cal.3d 857, 865 [2 Cal.Rptr.2d 2, 819 P.2d 843].)

Rule 2.831 is directory rather than mandatory to the extent that it imposes requirements beyond those imposed by article VI, section 21, of the California Constitution, itself. (*In re Richard S., supra,* 54 Cal.3d at pp. 865–866.) Therefore, failure to strictly comply with rule 2.831 is a waiveable error. (*In re Richard S.,* at pp. 865–866; *In re Julio N.* (1992) 3 Cal.App.4th 1120, 1123 [5 Cal.Rptr.2d 86].) More to the point, it is also now settled that a stipulation for the appointment of a temporary judge need not be in writing or even expressly made but can be implied from the conduct of the parties. (*Estate of Fain* (1999) 75 Cal.App.4th 973, 988 [89 Cal.Rptr.2d 618].) " '[A]n *implied* stipulation arises from the parties' common intent that the subordinate officer hearing their case do things which, in fact, can only be done by a judge.' [Citation.]" (*In re Horton* (1991) 54 Cal.3d 82, 98 [284 Cal.Rptr. 305, 813 P.2d

---

[5] This rule was adopted as California Rules of Court, rule 244, effective January 1, 1949, amended and renumbered as rule 243.31, effective July 1, 2006, and amended and renumbered again as rule 2.831 in January 2007. In all its forms, this rule has required that the stipulation for appointment of a temporary judge be in writing. (See 23 West's Ann. Court Rules (2006 ed.) foll. rule 2.831, p. 178.)

1335].) Case law further establishes that an attorney has the power to stipulate to a temporary judge on behalf of his or her client and that the conduct of counsel in participating in a proceeding and tacitly recognizing the authority of the temporary judge constitutes an implied stipulation. (See generally *In re Julio N., supra*, 3 Cal.App.4th at p. 1123.)

In the present case, Judge Grant's July 19, 1994, order confirms that appellants orally stipulated to the appointment of a temporary judge prior to the execution of the July 26, 1994, written agreement. Alternatively, the evidence before us compels the conclusion that appellants impliedly stipulated to Justice Low's appointment. The record shows that appellants participated, without objection, in 16 hearings and four family meetings before Justice Low during the 18 months of probate administration that followed his formal appointment by Judge Grant. Furthermore, at some point during that time period, appellants each obtained separate counsel who also participated in proceedings before Justice Low without objection.

At oral argument before this court, appellants' counsel was adamant that appellants did not impliedly consent to Justice Low's appointment. Counsel took the position that appellants' passive participation in the probate proceedings is insufficient to establish an implied stipulation, particularly in light of the fact that appellants did object to Justice Low's appointment when they first became actively involved in this case by filing their 1996 objections to Michael's final probate account and report.

The voluminous records before us do not support casting appellants in the roles of passive participants. Furthermore, appellants' March 18, 1996, objections to Michael's final probate account did not contain an objection to Justice Low's appointment as temporary judge pursuant to the 1994 stipulation. As reflected in our factual summary, appellants' March 18, 1996, pleading included a request that, *in the future*, trust-related matters be resolved by the probate court rather than by Justice Low. However, appellants did not question the validity of Justice Low's 1994 appointment nor in any way challenge his authority to resolve the numerous matters that had been presented to him during the probate administration. Thus, this document only reinforces our conclusion that appellants were parties to the 1994 stipulation pursuant to which Justice Low was appointed a temporary judge in this case.

3. *Justice Low Was Authorized to Resolve Family Disputes During Probate Administration*

■ Justice Low was empowered by the 1994 stipulation to act as a temporary judge until final determination of the "cause" that was assigned to him. (Cal. Const., art. VI, § 21.) A cause is defined as " 'the proceeding

before the court.' " (*In re Steven A.* (1993) 15 Cal.App.4th 754, 768 [19 Cal.Rptr.2d 576].) " '[T]emporary judges may be appointed to hear causes connected with but distinct from the underlying principal case. [Citations.] The appointment of a temporary judge to hear a particular "cause" carries with it the power to act until the final determination of *that proceeding.* [Citation.] Such appointment does not, however, authorize the temporary judge to act in distinct proceedings, albeit ancillary to the same principal action, without being appointed and qualified for that purpose.' " (*Ibid.*)

■ As we proceed to identify the cause or causes that were assigned to Justice Low pursuant to the 1994 stipulation, we are guided by the rule that stipulations for the appointment of a temporary judge must be construed narrowly. This is an especially important rule in this context because the jurisdiction of the temporary judge to try a cause derives from the parties' stipulation (*In re Horton, supra,* 54 Cal.3d at p. 90) and " '[t]he parties have the power to define and circumscribe the authority of a temporary judge . . . .' " (*Orange County Dept. of Child Support Services v. Superior Court* (2005) 129 Cal.App.4th 798, 807 [28 Cal.Rptr.3d 877].) Furthermore, construing the power of a temporary judge narrowly enforces the temporary nature of that power. (*Reisman v. Shahverdian* (1984) 153 Cal.App.3d 1074, 1096 [201 Cal.Rptr. 194].) "The word temporary, as used in this context, does not speak to the employment status or frequency of appointment of the temporary judge vis-à-vis the employing court. Instead, it indicates that the temporary judge becomes a judge only on stipulation of the parties litigant and remains a judge only until the stipulated cause is determined." (*Id.* at p. 1092.)

To identify the causes assigned to Justice Low, we have considered Judge Grant's July 19, 1994, order describing the parties' stipulation, the July 26, 1994, written stipulation signed by Arnold and Michael, and Judge Grant's August 26, 1994, appointment order. Taken together, these sources establish that the "causes" Justice Low was authorized to adjudicate were proceedings to resolve disputes between Arnold and the beneficiaries of Elsie's *probate* estate regarding implementation of the August 1993 settlement agreement and the disposition of Elsie's probate estate.

The July 19, 1994, order discloses that the impetus for the agreement to appoint a temporary judge was the need to resolve "administrative and interpretive issues related to the implementation of the Settlement Agreement," which were impeding a final distribution of Elsie's probate estate. The fact that the July 26, 1994, agreement was signed by Arnold and by Michael in his capacity as executor of the probate estate confirms that the impediment to final distribution of the probate estate was the dispute between Arnold and

his children regarding ownership of assets acquired by Arnold and Elsie prior to Elsie's death. Judge Grant's August 26, 1994, order appointing Justice Low, like her July 19 order, confirms that everyone understood that the temporary appointment would end when the probate estate was in a posture to be closed, at which time the matter would be transferred back to the probate court for review of the probate administrator's final account and final distribution of the assets of Elsie's probate estate.

Our conclusion that the causes Justice Low was assigned to adjudicate were limited to proceedings occurring during administration of the probate estate is reinforced by Justice Low's February 28, 1996, written report to Judge Grant in which Justice Low expressly acknowledged that his assignment as a temporary judge in this case was complete. Also consistent with our conclusion are appellants' March 18, 1996, objections to Michael's final probate estate accounting wherein they expressly objected to the proposal that future trust-related matters be referred to Justice Low rather than the probate court.

The record before us establishes that Justice Low's assignment as a temporary judge pursuant to the 1994 stipulation formally ended on March 1, 1996, when he filed his order transferring Elsie's probate case back to Judge Grant for approval of the final accounting and final distribution of the estate. As noted in our factual summary, Judge Grant subsequently approved Michael's final probate accounting, and this court affirmed Judge Grant's order in November 1997. (See *Estate of Gridley, supra*, A074510.) In that decision, we, too, expressed our understanding that Justice Low had completed his assignment, as a temporary judge in this case. (See *ibid.* ["Upon completion of his assignment, Judge Low prepared a report containing his recommendations to superior court Judge Isabella Horton Grant . . ."].)

### 4. *Justice Low Was Not Authorized to Adjudicate the Dixon Ranch Petition*

Elsie's probate estate was closed on April 23, 1996. Almost ten years later, appellants filed the Dixon Ranch petition, which relates to events that occurred during administration of Elsie's trust estate. Nevertheless, respondents maintain that the 1994 stipulation authorizes Justice Low to hear the Dixon Ranch petition because it is a "direct progeny" of the causes that were assigned to Justice Low in 1994.

██ When called upon to determine whether a matter falls within a cause assigned to a temporary judge for resolution, courts apply the rule that "[t]he determination of a cause encompasses subsequent proceedings that are its 'direct progeny,' but not those considered 'ancillary' to the stipulated cause.

[Citation.] Direct progeny are those which are a continuation of the stipulated cause or question its finality, such as motions to vacate or reconsider. [Citations.] An ancillary proceeding, on the other hand, is heard on a separate record and seeks an independent judgment or reviewable order. [Citation.]" (*Orange County Dept. of Child Support Services v. Superior Court, supra*, 129 Cal.App.4th at p. 807.)

■ The 2006 Dixon Ranch petition is *not* a direct progeny of the causes assigned to Justice Low in 1994. It does not effectuate a continuation of the probate proceedings or question in any way the finality of the disposition of Elsie's probate case. Rather, the 2006 Dixon Ranch petition is an ancillary proceeding, completely separate from the probate case, which will be heard on its own record and result in an independent judgment. "Ancillary proceedings are not a continuation of the stipulated cause, and the temporary judge has no power to hear them absent a new stipulation." (*Reisman v. Shahverdian, supra*, 153 Cal.App.3d at p. 1095; see also *McCartney v. Superior Court* (1990) 223 Cal.App.3d 1334, 1338 [273 Cal.Rptr. 250]; *Walker v. San Francisco Housing Authority* (2002) 100 Cal.App.4th 685, 692 [122 Cal.Rptr.2d 758].) Therefore, we hold that the 1994 stipulation does not authorize Justice Low to adjudicate the 2006 Dixon Ranch petition.

Respondents also contend that paragraph 1.7 of the amended ENGIT is a separate stipulation which authorizes Justice Low to adjudicate the Dixon Ranch petition. As discussed in our factual summary, in February 1995, Michael and Arnold executed an amended ENGIT trust agreement, which contains the following provision: "The trustee, at his election, may select the Probate Court or Judicial Arbitration and Mediation Services, Inc. for the interpretation and enforcement of this agreement." Appellants question the validity of the amended ENGIT, arguing that the attempted modification of Elsie's irrevocable trust was ineffectual absent consent of all the beneficiaries or a court order. (See Prob. Code, §§ 15403, 15404.) Whether the ENGIT was properly or effectively modified is not before us here. The relevant question, for our purposes, is whether this document contains a stipulation for the appointment of a temporary judge within the meaning of article VI, section 21, of our state's Constitution. We hold that it does not.

Paragraph 1.7, the provision upon which respondents rely, purports to give Michael sole discretion to select the adjudicator who will decide any dispute arising during the period of trust administration. This one-sided provision does not identify a particular cause, parties to a hypothetical cause, or the temporary judge who will be appointed. Indeed, the provision expressly contemplates that there may be no such appointment. This provision cannot reasonably be construed as a stipulation for appointment of a temporary judge. Even if it could be, appellants did not sign the amendment that added

this provision to the ENGIT and there is no evidence they impliedly consented to it. Furthermore, and more to the point, the clear intent of paragraph 1.7 was to facilitate the resolution of anticipated disputes *between Arnold and the trust estate.* The Dixon Ranch petition is not a dispute between Arnold and the trust estate. Indeed, it was filed almost two years after Arnold died.

We do find evidence suggesting there may have been a separate implied and/or informal stipulation among the members of Elsie's family for the temporary appointment of Justice Low to resolve some trust-related matters during the period of Arnold's life. The best evidence of this possible stipulation is an April 10, 1995, order that Justice Low filed while he was acting as a temporary judge pursuant to the 1994 stipulation to resolve probate administration disputes. In that order, Justice Low stated: "The parties have previously agreed that J.A.M.S/ENDISPUTE and Justice Low will retain jurisdiction to resolve all trust matters and other related disputes during Arnold S. Gridley's life." However, it is difficult to square Justice Low's statement with appellants' March 18, 1996, pleading wherein Patricia and Christine expressly objected to the appointment of Justice Low or any temporary judge for the purpose of resolving trust estate disputes because of cost concerns.

Ultimately, we need not decide whether there was a separate implied stipulation for the temporary appointment of Justice Low to resolve trust-related disputes during Arnold's life. Such a stipulation, if it existed, would not have encompassed adjudication of *the Dixon Ranch petition* because that petition was not filed until almost two years after Arnold died.

At oral argument, respondents' counsel argued that, regardless of how we construe appellants' 1996 objection to Justice Low's future involvement in this case, *the fact remains that appellants proceeded to participate in trust* proceedings conducted before Justice Low and thereby consented and stipulated to his appointment as a temporary judge in the trust administration phase of this case. This argument highlights a flaw that runs throughout respondents' arguments: Respondents cannot establish that appellants have impliedly stipulated that Justice Low can hear the Dixon Ranch petition by relying on evidence of appellants' past participation in unrelated legal proceedings before Justice Low.

There is no question on this record that both the 1994 stipulation that was operative during the period of probate administration, as well as any stipulation that could be implied from appellants' conduct during trust-related proceedings, pertained *solely* to family disputes. The Dixon Ranch petition is not a dispute among the members of Elsie's family. This petition presents a

new and separate cause which is not a direct progeny of any stipulated cause. Indeed, this petition alleges substantive claims against third parties who are not beneficiaries of Elsie's trust estate. There is absolutely no evidence that the parties to the Dixon Ranch petition entered into a stipulation that adjudication of that petition could be assigned to Justice Low or to any temporary judge. Even if those respondents who are not members of Elsie's family are now amenable to appointing Justice Low as a temporary judge, appellants certainly are not, and they never have agreed that Justice Low could adjudicate their claims against these parties.

Pursuant to the 1994 stipulation, Justice Low was authorized to resolve Arnold's disputes with his children who were beneficiaries of Elsie's probate estate. The Dixon Ranch petition relates to events that occurred after Elsie's probate estate was closed and makes claims against nonfamily members who had absolutely no involvement in the disputes which led to the 1994 stipulation. Although there may be some reasonable disagreement about the length of time during which appellants tacitly consented to Justice Low's authority to resolve family disputes during the period of trust administration, the evidence is clear that appellants have consistently refused to stipulate to or acknowledge Justice Low's authority to adjudicate the Dixon Ranch petition.

For all these reasons, we hold that Justice Low does not have authority to adjudicate the 2006 Dixon Ranch petition. With this fact established, we turn to the issues raised by the appeals and writ petition.

B. *The Orders Denying the Motion to Disqualify Winslow*

Appellants appeal the denial of the motion to disqualify Winslow on the grounds that (1) Justice Low did not have authority to rule on the disqualification motion; and (2) Winslow has irreconcilable conflicts of interest that require his disqualification.

Our conclusion that Justice Low's power as a temporary judge does not extend to adjudication of the 2006 Dixon Ranch petition pertains equally to the orders on the disqualification motion and requires those orders to be reversed.

We also note for the record that we have grave concerns about the propriety of Winslow's apparently conflicting roles as attorney for Elsie's trust estate and as a respondent and a partial owner of the Dixon Ranch. Furthermore, the evidence before us does not easily square with Justice Low's conclusion that Winslow did not formerly represent these appellants. Nevertheless, we are cognizant of our role as a court of review and, therefore, leave these questions for the superior court to answer.

## C. *Justice Low's April 2007 Order*

Pursuant to their second appeal in this consolidated action, appellants seek reversal of Justice Low's April 2007 order, pursuant to which he determined he would adjudicate eleven of the causes of action in the Dixon Ranch petition and remanded four claims from that petition to the probate court. Respondents contend the April 2007 order is not appealable because it is an intermediate ruling regarding Justice Low's authority that was made in response to Judge Dearman's June 29, 2006, order, and because it is not among the orders made appealable by the Probate Code.

In contrast to Judge Dearman's order, which was the subject of the 2006 appeal, Justice Low's April 2007 order is not an intermediate ruling. It is his final determination regarding the scope of his authority to adjudicate the Dixon Ranch petition. Nevertheless, the order is appealable only *if it is* "made appealable by the provisions of the Probate Code . . . ." (Code Civ. Proc., § 904.1, subd. (a)(10).)

 Section 17200 of the Probate Code (section 17200) provides that a trustee or beneficiary of a trust may petition the court "concerning the internal affairs of the trust or to determine the existence of the trust." (§ 17200, subd. (a).) With two exceptions not relevant here, final orders under section 17200 are appealable orders. (Prob. Code, § 1304, subd. (a).)

Respondents contend that the April 2007 order is Justice Low's determination regarding his authority, a matter that is not within the ambit of section 17200.[6] Even if we accept this proposition, which is not supported by authority or any reasoned analysis, respondents overlook the principle that, when an order that might not otherwise be appealable "expressly or implicitly decides other issues that could be the subject of an appealable probate order," the order is appealable. (*Esslinger v. Cummins* (2006) 144 Cal.App.4th 517, 522 [50 Cal.Rptr.3d 538]; see also *Evangelho v. Presoto* (1998) 67 Cal.App.4th 615, 622 [79 Cal.Rptr.2d 146].)

---

[6] Respondents complain that appellants improperly attempted to "manufacture appealability" in the lower court by filing an unnecessary pleading on February 5, 2007, and calling that document a section 17200 petition because they knew full well that orders on section 17200 petitions generally are appealable orders. The appealability of a probate order depends on its legal effect, not on its form. (*Estate of Martin* (1999) 72 Cal.App.4th 1438, 1442 [86 Cal.Rptr.2d 37].) Thus, the label given to appellants' pleading is no more determinative of appealability than is the fact that the April 2007 order itself contains language (drafted by Winslow) which is clearly intended to insulate this order from appellate review.

Here, Justice Low's determination that he had authority to decide significant parts of the Dixon Ranch petition was based on his interpretation of the amended ENGIT and his determination that paragraph 1.7 of that instrument authorized Michael to select the venue for resolving the Dixon Ranch petition. These two determinations regarding the construction of the ENGIT and the scope of the trustee's power are matters within the ambit of section 17200. That section expressly states that proceedings concerning the internal affairs of the trust include, but are not limited to, proceedings to resolve questions regarding the construction of a trust instrument and proceedings challenging the validity of a trust provision. (§ 17200, subd. (b)(1), (3).) Case law confirms that "[a]n order determining the existence of a power, duty, or right under a trust is appealable. [Citations.]" (*Esslinger v. Cummins, supra,* 144 Cal.App.4th at p. 523.) Therefore, we find that the April 2007 order is appealable as a final order determining questions regarding the internal affairs of the ENGIT and the trustee's authority to dictate the forum in which trust-related disputes would be resolved.

The April 2007 order must be reversed. As discussed above, Justice Low erred by concluding that he had authority to adjudicate any part of the Dixon Ranch petition.

## D. *The Writ Petition*

By their writ petition, respondents seek reversal of Judge Dearman's orders consolidating before him (1) all of the causes of action alleged in the Dixon Ranch petition and (2) Michael's accounting petitions. We summarily deny the writ petition.

Respondents erroneously allege that the perfecting of appellants' two appeals deprived Judge Dearman of jurisdiction and, therefore, Judge Dearman created a jurisdictional conflict between the probate court and this court by issuing the consolidation orders. "[T]he perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order . . . ." (Code Civ. Proc., § 916, subd. (a).) However, "an appeal does not stay proceedings on 'ancillary or collateral matters which do not affect the judgment [or order] on appeal' even though the proceedings may render the appeal moot. [Citation.] . . . [¶] A postjudgment or postorder proceeding is . . . ancillary or collateral to the appeal despite its potential effect on the appeal, if the proceeding could or would have occurred regardless of the outcome of the appeal. [Citation.]" (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 191 [25 Cal.Rptr.3d 298, 106 P.3d 958].) Here, Judge Dearman's orders addressed an issue that was unquestionably ancillary or collateral to the appeals, i.e., whether, regardless of the

outcome of the dispute regarding Justice Low's authority, appellants were entitled to have all of the claims in the Dixon Ranch petition resolved in one place.

Respondents also erroneously contend that writ relief is "imperative to settle the jurisdictional conflict between Justice Low and Judge Dearman over who should hear and resolve disputes arising from the accountings and the related [Dixon Ranch] petition." On their face, the orders challenged by this writ petition do not create a jurisdictional conflict. Judge Dearman did not take this case away from Justice Low, as respondents repeatedly intimate. Instead, Justice Low made the decision to retain eleven of the claims in the Dixon Ranch petition and transfer four causes of action to the probate department of the superior court. Even respondents' counsel acknowledged at oral argument before this court that Justice Low's ruling was troublesome.[7] In light of the potential problems that could result from two trials involving the same parties and clearly overlapping issues, Judge Dearman made the discretionary (and eminently reasonable, in our view) ruling that all of appellants' related claims should be resolved in one proceeding instead of two.

Judge Dearman did not expressly or impliedly resolve the parties' debate regarding the scope of Justice Low's authority to adjudicate the Dixon Ranch petition. Indeed, at one of the hearings on the consolidation motion, Judge Dearman made clear that his ruling had nothing to do with Justice Low's jurisdiction but was based instead on his concern about the cost associated with conducting a second trial before Justice Low, who would have to be paid for his time.[8]

██ Finally, we hold that the challenge to Judge Dearman's discretionary decision to consolidate undeniably related proceedings in the lower court is now, itself, a moot question. General principles of mootness apply to writ petitions. (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2007) ¶ 15:17, pp. 15-13 to 15-14, and authority cited therein.) Here, we have already resolved that Justice Low does not have authority to adjudicate the Dixon Ranch petition. Therefore, alleged errors regarding the means by which this petition was transferred to the judge before whom it belongs are now moot.

---

[7] In the lower court, respondents took the position that the entire Dixon Ranch petition had to be resolved by Justice Low. Apparently, Justice Low could not be convinced to construe his temporary appointment that broadly.

[8] Judge Dearman stated: "The most compelling thing to me is the cost. You know, that [Justice Low charges] $500 an hour, that's an awful lot of money. And that has played a big part since I've been with this case. So I hope the appellate court rules quickly. Maybe it will resolve a number of the issues. And maybe it will end up back with Justice Low."

## IV. DISPOSITION

The orders denying appellants' motion to disqualify Winslow and the April 2007 order are reversed. The petition for writ of mandate is summarily denied. This case is remanded to the probate court for further proceedings consistent with this decision.

Appellants are to recover their costs in this consolidated appeal and writ proceeding.

Kline, P. J., and Richman, J., concurred.

The petition of defendants and respondents for review by the Supreme Court was denied December 10, 2008, S168037.