Filed 8/6/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RAYMOND BLECH, | B268326 |
| Objector and Appellant, | (Los Angeles County Super. Ct. No. BP135753) |
| v. | |
| RICHARD BLECH et al., | |
| Objectors and Respondents; | |
| COMERICA BANK, as Trustee, etc., | |
| Respondent. | |

APPEALS from orders of the Superior Court of Los Angeles County, Lesley C. Green, Judge. Affirmed in part and dismissed in part.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of sections I, II, III, IV, V, VII and VIII of the Discussion.

Keystone Law Group, Shawn S. Kerendian and Lindsey F. Munyer; Law Offices of James A. Bush and James A. Bush for Objector and Appellant Raymond Blech.

Adam L. Streltzer for Objector and Respondent Richard Blech.

Wolf, Rifkin, Shapiro, Shulman & Rabkin and Christopher J. Heck for Objectors and Respondents Robert Bleck and Linda Sue Grear.

Buchalter, Robert M. Dato, Robert S. Addison, Jr., and Stuart A. Simon for Respondent Comerica Bank, as Trustee, etc.

———————————

Arthur Blech died in 2011, leaving an estate worth in excess of $65 million.  At his death, his estate planning documents included the Arthur Blech Living Trust, as amended, and his will, which provided for the "pour over" of most of his remaining assets into the Trust, to be administered as part of the corpus of the Trust by a third party trustee.  Arthur left most of his estate in unequal shares to his four children, Raymond, Richard, Robert and Jenifer.[1]  The current successor trustee is respondent Comerica Bank.

---

[1]    For clarity, we refer to family members by their first names; we mean no disrespect.  We also note Robert spells his surname "Bleck" and Jenifer is also known as Jenifer Rush and as Linda Sue Grear.

2

The issues presented in this appeal relate to how to account for the sale of the 3,050-acre Blech Ranch (the Ranch or the Blech Ranch), located in San Luis Obispo County, California. When the Trustee filed a petition for approval of its first accounting in October 2014, Raymond objected to the allocation, principally on the basis that all of the capital gains tax (income tax) on the sale was allocated to his share. The probate court bifurcated that issue from other objections to this petition and, after a hearing, determined that allocation to be appropriate. Thereafter, with the exceptions we consider on this appeal, the Blech Children resolved their differences, entered into separate settlement agreements with the Trustee and stipulated that the court could enter an order approving the Trustee's first accounting.

Raymond has filed four separate appeals from the probate court's rulings. In the unpublished portions of this opinion, we resolve which of those appeals is viable and other procedural issues; also confirming the award of attorney fees to three of the Blech Children. In the published portion of this opinion we determine that the gift of the Blech Ranch (and of its equivalent in cash as of the date of its sale) was a funding mechanism for Raymond's 35% share of the remainder or residue of the estate rather than an additional specific gift to him.

---

When we reference the children as a group, we use the terms "Blech Children" or "the siblings."

## FACTUAL AND PROCEDURAL HISTORY[2]

Arthur executed the Arthur Blech Living Trust (the Trust) in 2009, designating himself its initial trustee. At the same time, he executed a will in which he made certain specific bequests, and provided for the "pour over" of the balance of his estate into the Trust. In 2010, he amended article 5.4 of the Trust, adjusting the share for his son Robert to reflect a loan made to him. Arthur died on January 13, 2011. Following the declination by the

---

[2] During the pendency of this appeal, on March 2, 2018, Raymond filed a request for judicial notice pursuant to Evidence Code sections 452, 454 and 459, or in lieu thereof, a request that we take additional evidence as permitted by Code of Civil Procedure section 909, seeking to have this court take judicial notice of the contents of the reporter's transcript of proceedings in the probate court which occurred on January 10, 2018, and of a declaration of William Buckley, a senior vice president of the Trustee. Respondents filed oppositions to these requests.

These requests are denied for the following reasons. In reviewing the correctness of the probate court's determination, we consider only those matters that were part of the record at the time an order or judgment was entered (with limited exceptions, none of which is present). (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813; see also *In re Zeth S.* (2003) 31 Cal.4th 396, 407-410, 413 [it is generally inappropriate for an appellate court to look to matters not before the trial court at the time it made its rulings].) Nor has Raymond suggested there are circumstances which qualify as "exceptional" to warrant taking evidence pursuant to Code of Civil Procedure section 909. (Cf. *Reserve*, at p. 813; *In re Conservatorship of Hart* (1991) 228 Cal.App.3d 1244, 1257.) Also, in its opposition, the Trustee advised us that the Buckley declaration was rejected by the probate court, an action which Raymond does not dispute. As this declaration was never admitted by the trial court, it would not qualify for judicial notice in any event.

originally named successor trustee to serve, first, Union Bank, N.A., and then Comerica Bank (the Trustee), served as successor trustee.

Article 5 of the Trust set out the terms of administration and distribution of Arthur's assets on his death, providing for: distribution of his personal effects in article 5.2, and the making of specific distributions of cash to Robert, Richard and Jenifer and other named individuals, and of a gift of a specified parcel of real property to Raymond, in article 5.3. Article 5.4 provided for distribution of the remainder of the trust estate as follows: 25 percent to Robert, 15 percent to Jenifer, 25 percent to Richard, and 35 percent to Raymond, provided that Raymond's share "shall include any interest that [Arthur] . . . owns in the ranch [in San Luis Obispo County]."[3] Article 5.5 provided for payment of income and estate taxes as follows: "All estate taxes payable by this Trust shall be paid by the beneficiaries listed in Paragraph 5.4 above in direct proportion to their respective percentage shares. Income taxes payable by any subtrust shall be paid by the beneficiary of such subtrust." Article 5.7 provided that the gifts made in article 5.4 would be distributed to the Blech Children in fractional interests over a 10-year period.

In late 2013, Raymond negotiated the sale of the Ranch for $14 million, signing an agreement for its sale in December 2013.

---

[3] Raymond was designated manager of the Ranch in its Operating Agreement. He had lived for many years on an adjacent parcel in the house located on 78 acres of land which was also left to him in article 5.3 of the Trust.

Jenifer's share included a provision similar to that for Raymond, referencing a certain residence in Montana if the Trust then owned it.

5

The sale price represented a gain over the estate tax basis for the Ranch of approximately $6.8 million.[4]

Prior to presenting the sale to the probate court for approval, the Trustee distributed to the Blech Children a financial analysis (the spreadsheet) which contained estimated allocations of assets in the trust estate to each beneficiary pursuant to the terms of the Trust, also allocating estimated expenses chargeable to each sibling, as well as net distributable amounts to each. The second line of the spreadsheet contained the following: "For Discussion Purposes – Not Final Calculations and May Not Be Relied Upon for Any Purposes."

On February 13, 2014, the probate court approved the sale, which closed on March 25, 2014. The income tax on the sale was charged against Raymond's share.

The Blech Children became engaged in numerous intra-family disputes, including those concerning allegations of mismanagement of a 19-story office tower owned by the Trust; allegations that two of the siblings had received improper distributions; and allegations of improper actions by Raymond acting as executor of the will. These disputes led to lawsuits among the Blech Children; by the then-trustee (Union Bank) against certain of the Blech Children; the filing by Robert and Jenifer of a petition for suspension of Raymond's powers and his removal as executor; the filing of objections to Raymond's First Account of Executor; and the filing by Raymond of a Petition for Contractual Indemnity and other relief arising out of his actions as executor. The Blech Children reached a tentative settlement

---

[4]    The income tax on this sale was estimated at 33 percent of the gain, or approximately $2,376,000.

6

of their disputes over Raymond's work as executor of the will six days prior to a July 2014 court hearing on that matter. That settlement was memorialized in a Settlement Agreement and Release, executed as of August 27, 2014 (the 2014 Settlement Agreement), in which the Blech Children agreed upon mutual releases of all claims, known or unknown, specifically referencing and waiving their rights under Civil Code section 1542, reserving, however, their individual rights to pursue certain claims (e.g., the right to dispute expenses of administration of the estate and trust arising on and after August 1, 2014, or not paid prior to that date).[5]

Paragraph 15 of the 2014 Settlement Agreement specifies that each of the Blech Children "takes complete responsibility for any tax liability which may arise from that party's receipt of any consideration, asset . . . or any other form of monetary or nonmonetary value received under this Agreement or in connection herewith, including from the Estate, the Trust, any asset of the Estate or Trust . . . [or] Blech Ranch Company, LLC . . . . Each party agrees that any tax liability, whether local, state, federal or other, arising from such receipt by or to that party . . . including but not limited to property taxes, reassessment penalties, gift taxes, income taxes, or estate taxes, shall be that party's sole responsibility."

---

[5] This 2014 Settlement Agreement, among the Blech Children only, is to be distinguished from two settlement agreements, among different groups of the Blech Children and the Trustee, and which we describe and reference, *post*, as the 2015 Settlement Agreements.

The Trustee filed its First Account and Report of Trustee and Petition for Approval Thereof; Petition for Allowance of Extraordinary Trustee's Fees (the Petition) on October 29, 2014. The probate court granted an extension of time in which to file objections to the Petition, setting the deadline to do so at January 15, 2015. On that date, Raymond filed a set of objections, as did Robert and Jenifer. Following the Trustee's filing of responses to his objections, on May 19, 2015, Raymond filed a Supplement to Objections (Supplemental Objections) in which he raised for the first time the objection that the gift of the Ranch to him had been improperly characterized as a specific gift when, in his view, it should be characterized as a residuary gift. If characterized as a residuary gift, Raymond argued, the "expenses and costs of such gifts should be borne by the Trust as a whole."[6]

At the June 11, 2015 trial setting conference on the Petition, and with the consent of the parties, the probate court bifurcated Raymond's Supplemental Objections, setting them for determination in advance of hearing the parties' other objections to the Petition.

At the conclusion of the hearing on the Supplemental Objections on July 13, 2015, the probate court affirmed the Trustee's deduction of the income tax and other expenses attributable to the Ranch from the proceeds of the sale and from

---

[6] Thus, the $2.3 million in income tax on the sale of the Ranch (see fn. 4, *ante*) would have been shared among all of the Blech Children, rather than being paid from Raymond's inheritance alone.

On April 6, 2015, Raymond's counsel had written a letter to the Trustee's counsel in which he raised the same argument.

Raymond's share of the inheritance, rejecting Raymond's contrary claims, and specifically finding that the Trustee's actions "satisfied the intent of the Trustor, Arthur Blech."[7] The probate court also ruled Raymond had "consented to and affirmed [the Trustee's] treatment of the Blech Ranch gift [pursuant to Probate Code section 16465], and the other Beneficiaries relied upon Raymond's actions, and Raymond is thus estopped from now challenging that treatment." In addition, it ruled Raymond had released the specific objections made in his Supplemental Objections by signing the 2014 Settlement Agreement. The probate court filed an Order Overruling Raymond Blech's Supplement to Objections to Trustee's First Account and Report on August 19, 2015 (August 19, 2015 Order) setting out these determinations. Notice of entry of that order was given on September 10, 2015.

Two months later, on September 28, 2015, Robert and Jenifer sought to enforce the 2014 Settlement Agreement by filing their Motion to Enter Judgment on Settlement Agreement, Enforce Settlement Agreement, and for Attorneys' Fees and Costs. The probate court considered this motion to be "premature," and, on October 30, 2015, placed it off calendar.

Seeking to overturn the August 19, 2015 Order, Raymond filed a motion for new trial and a motion to vacate. The probate

---

[7] The probate court stated it was relying in part on articles 5.5 and 5.6 of the Trust and Probate Code sections 21117, 21118, and 16374, subdivision (a).

The court also stated both that "[Arthur] included [the Ranch] in the part [i.e., article 5.4(b) of the Trust] that says that Raymond will get 35 percent" and that the gift of the Ranch was not a residuary gift. As we discuss, *post*, these statements are contradictory and the latter is an error of law.

9

court denied these motions on October 30, 2015, noting no judgment had been entered and the orders made in August following the trial on the bifurcated issue were not separately appealable.

During the late summer and fall of 2015, the parties had negotiated and reached agreements to resolve all of the objections to the Petition except for Raymond's Supplemental Objections. They set out their settlements in two agreements, one among the Blech Children other than Raymond and the Trustee, and another between Raymond and the Trustee. (These documents are collectively referred to as the 2015 Settlement Agreements.) In the latter agreement, Raymond reserved his right to appeal the probate court's August 19, 2015 Order. With the 2015 Settlement Agreements signed, the Blech Children stipulated to have the probate court enter an order approving the Petition based on those agreements, also preserving Raymond's Supplemental Objections for appeal. The probate court filed its Order Granting Stipulated Ex Parte Application for Entry of Order Approving Settlement of Trustee's First Account on October 23, 2015 (October 23, 2015 Order).[8]

_____

[8] We have considered – and reject – the argument that the October 23, 2015 Order left unresolved Raymond's Supplemental Objections. As we read this Order in the context of the proceedings that had taken place in the probate court up to October 23, 2015, the Order signed and filed that date fully resolved in the probate court all of the issues between the parties with respect to the Petition. Thus, the October 23, 2015 Order was a final order with respect to the Petition, and the proper subject for an appeal. (See Discussion, Section I, *post*.) The probate court judge had the same understanding of this Order when the issue was discussed on October 30, 2015.

10

On October 30, 2015, the probate court denied Raymond's motions for new trial and to vacate its rulings on his Supplemental Objections and took off calendar Robert and Jenifer's motion to enforce the 2014 Settlement Agreement.

On November 6, 2015, Robert and Jenifer renewed their motion to enter judgment on the 2014 Settlement Agreement and for attorney fees. Also on that date, Raymond renewed his motion for new trial and his motion to vacate.

The motion for new trial and motion to vacate were heard and submitted on December 4, 2015; the probate court's ruling on these matters was issued on December 29, 2015. Raymond filed a notice of appeal of these matters seven days prior to the ruling issued by the probate court, on December 22, 2015. The court denied both motions in its December 29, 2015 ruling.

Robert and Jenifer's motion to enter judgment and for attorney fees and costs was heard and granted on January 7, 2016.[9] Raymond filed a timely notice of appeal of these rulings on February 4, 2016.

---

[9] Because the record reflects two efforts to obtain entry of judgment but no judgment appears in the record on appeal, we sent a letter to the parties inquiring, inter alia, if a judgment had ever been entered. In response to our letter, Raymond, on the one hand, and Robert and Jenifer, on the other, filed requests that we take judicial notice of the judgment entered on February 19, 2016. While we grant those requests (Evid. Code, §§ 452, subd. (d) & 459, subd. (a)), we do not find these judgments relevant to resolving the issues raised by the several notices of appeal.

For reasons we discuss in footnote 8, *ante*, and more fully in the text, *post*, the October 23, 2015 Order fully resolved the issues in the Trustee's Petition then before the probate court and

11

Robert and Jenifer filed a second motion, for additional attorney fees and costs, which the probate court also granted, and

is itself an appealable order. We note that it was entered in part based on the 2014 and 2015 Settlement Agreements among the parties which contained provisions authorizing a court to enforce the terms of those agreements. The October 23, 2015 Order granted the Trustee's Petition, also making reference to these settlement agreements and approving their terms.

It was not until February 2016 that the first of the two "judgments," was signed and filed. This was well after the probate court no longer had jurisdiction over the matters determined in the October 23, 2015 Order as a consequence of Raymond's December 22, 2015 appeal, which terminated the probate court's jurisdiction over the orders identified in the December 2015 notice of appeal, including the October 23, 2015 Order. (Code Civ. Proc., § 916, subd. (a); see *Critzer v. Enos* (2012) 187 Cal.App.4th 1242, 1249 [trial court lacked jurisdiction to enter a judgment while an appeal was then pending]; *Varian Medical Systems, Inc. v. Delfino* (2017) 35 Cal.4th 180, 198-199 [further trial court proceedings on issues addressed in notice of appeal were beyond trial court's jurisdiction and void]; see Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2017) ¶ 7:2.)

Also following our inquiry, Robert and Jenifer sought judicial notice of the judgment entered on April 25, 2016, reflecting the order granting them attorney fees, filed March 18, 2016. That order was independently appealable; the April judgment was issued after the probate court had lost jurisdiction in that matter. (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1015; see also *Sjoberg v. Hastoff* (1948) 33 Cal.2d 116, 119 [appeal allowed if the order is final in a collateral proceeding "growing out of the action"].) The appeal of this order was based on the March order, and properly so. For these reasons, we do not give further consideration to these two postorder "judgments."

12

from which Raymond filed a timely notice of appeal on May 2, 2016. With the stipulation of the parties, we consolidated these appeals.

## CONTENTIONS

Raymond frames the primary issue on appeal as whether the probate court erred in allocating the postdeath appreciation in the Ranch among all of the Blech Children (with a consequence that his share in that appreciation was limited to his 35 percent of the residue) while charging Raymond with all postdeath taxes and expenses on the sale of the Ranch. Raymond also contends the probate court erred in finding he: (a) released any objections to the Trustee's allocations by his execution of the 2014 Settlement Agreement with his siblings, (b) consented to those allocations, and (c) is barred by equitable estoppel or laches from asserting his objections to the Trustee's treatment of his interest in Arthur's Trust. And, Raymond challenges the attorney fee awards made to his siblings as prevailing parties in the probate court.

Robert and Jenifer, joined by Richard, dispute Raymond's contentions, arguing: (a) the release contained in their 2014 Settlement Agreement precludes Raymond from prevailing on any of his claims; (b) he is estopped from asserting his claim; (c) he is barred by laches from doing so; (d) the probate court properly upheld the Trustee's allocation of gain; and (e) the attorney fee awards were proper.

The Trustee argues: (a) Raymond disclaimed in the probate court the allocation argument he now asserts; (b) his objections to the Trustee's accounting were barred because he accepted the distribution of the net proceeds from the sale of the Ranch without then raising the impact of the distribution on the

13

final amount to be allocated to him; and (c) he released all of his claims in the 2014 Settlement Agreement.

## DISCUSSION

## I. APPELLATE JURISDICTION

Before addressing the merits of Raymond's contentions, we must assess which of the matters identified by Raymond in his four notices of appeal present issues within our appellate jurisdiction.

### A. Whether an order is appealable

An order is appealable only when declared to be so by constitution or by statute. (*Northern Trust Bank v. Pineda* (1997) 58 CalApp.4th 603, 606, citing *Skaff v. Small Claims Court* (1968) 68 Cal.2d 76, 78.) Trust administration matters are among those as to which the right to appeal and the jurisdiction of appellate courts are regulated by statute. (*Northern Trust,* p. 606; *H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1365.)

Code of Civil Procedure section 904.1 sets forth the direction for our analysis. Subdivision (a)(10) provides: An appeal lies "[f]rom an order made appealable by the provisions of the Probate Code . . . ." Probate Code section 1300 states multiple bases for appeal, providing, in part: "In all proceedings governed by this code, an appeal may be taken from the making of, or the refusal to make, any of the following orders: [¶] (a) Directing, authorizing, approving, or confirming the sale, lease, encumbrance, grant of an option, purchase, conveyance, or exchange of property. [¶] (b) Settling an account of a fiduciary. [¶] (c) Authorizing, instructing, or directing a fiduciary, or approving or confirming the acts of a fiduciary. [¶] (d) Directing or allowing payment of a debt, claim, or cost. [¶] (e) Fixing, authorizing, allowing, or directing payment of compensation or

14

expenses of an attorney. [¶] (f) Fixing, directing, authorizing, or allowing payment of the compensation or expenses of a fiduciary."

An appeal from the October 23, 2015 Order concerning the Petition is within the scope of matters made appealable by this section.

In addition, Probate Code section 1304, subdivision (a) provides that "[a]ny final order under Chapter 3 (commencing with Section 17200 [of the Probate Code])" is appealable. (*Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1125-1126; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 2.191, p. 2-137.) In determining whether a matter is within the scope of Probate Code section 17200, the court determines the *effect* of that order rather than the *label* given to it. (*Estate of Miramontes-Najera* (2004) 118 Cal.App.4th 750, 756.) For example, although an order granting an accounting is not expressly made appealable by Probate Code section 1304, such an order is appealable when it implicitly decides an issue which may be the subject of an appealable order. (*Esslinger v. Cummins* (2006) 144 Cal.App.4th 517, 522 [order determining the existence of a power, duty, or right under a trust is appealable]; see also *Christie v. Kimball* (2012) 202 Cal.App.4th 1407, 1411 [same]; *Gridley v. Gridley* (2008) 166 Cal.App.4th 1562, 1586-1587 [same].)[10]

---

[10]     There is an exception to this rule, but it is limited to whether a *beneficiary* may obtain an accounting. Under that circumstance, an order to account is appealable when it expressly or implicitly decides other issues that could be the subject of an appealable order. (*Esslinger v. Cummins*, *supra*, 144 Cal.Appp.4th at p. 522.)

A second subdivision of Probate Code section 1304, subdivision (c), makes appealable "[a]ny final order under Part 1

15

Matters not authorized by statute for appellate review must be dismissed.  Thus, when an appellate court determines that it lacks appellate jurisdiction to hear a matter presented to it, it must act on its own motion and dismiss such an unauthorized appeal.  (*Rubin v. Western Mutual Ins. Co.* (1999) 71 Cal.App.4th 1539, 1548; *Northern Trust Bank v. Pineda, supra,* 58 Cal.App.4th at p. 608.)

**B.**     **Raymond's appeals**

With these principles set forth, we address the several appeals Raymond has filed.  (Although the appeals are consolidated, we must nevertheless address each of the now consolidated requests to determine whether exercise of our jurisdiction is proper as to each.)  The following list sets out the date of filing of the particular notice of appeal, followed by the date and a brief description of the orders to which that appeal is directed:

---

(commencing with Section 20100) . . . [of the Probate Code]." Section 20100 concerns the determination of liability for the payment of *estate taxes*.  In this case, the issues include which of the Blech Children should bear the effect of payment of the capital gains tax on the sale of the Ranch, an *income tax* issue not addressed by the cited statute.

16

(1) November 9, 2015: appealing the August 19, 2015 Order rejecting Raymond's Supplemental Objections and the October 30, 2015 Denial of Motion for New Trial and Motion to Vacate pursuant to Probate Code sections 1300, subdivisions (b)[11] and (c)[12] and section 1304, subdivision (a).[13]

(2) December 22, 2015: appealing the October 23, 2015 Order and the December 22, 2015 Denial of Motion for New Trial and Denial of Motion to Vacate.

(3) February 4, 2016: appealing the January 7, 2016 order issued under Probate Code sections 1300, subdivisions (b), (c), (e)[14] and 1304, subdivision (a).

(4) May 2, 2016: appealing the March 18, 2016 order (citing the same statutes as the February 4, 2016 appeal).

    1.    <u>The appeal from the October 23, 2015 Order</u>

This appeal, as indicated by its description, is from the Order resolving all issues with respect to the Petition (and preserving Raymond's contentions regarding the nature of the gift of the Ranch and how the Ranch should be valued). Raymond clearly objected to certain aspects of this Order and, for

---

[11] This statute authorizes appeal from an order settling an account of a fiduciary.

[12] This statute authorizes an appeal from an order "authorizing, instructing, or directing a fiduciary, or approving or confirming the acts of a fiduciary."

[13] As noted, *ante*, this statute authorizes appeal of any order listed in Probate Code section 17200 which is final (with exceptions not relevant in this case).

[14] The terms of this statute are set out in the text, *ante*.

17

the reasons discussed, *ante*, this is an appealable order. (Code Civ. Proc., § 904.1, subd. (a)(10); Prob. Code, §§ 1300, subds. (b) & (c), 1304, subd. (a).)

2.     The appeal from the August 19, 2015 Order

By his November 9, 2015 notice of appeal, Raymond also seeks to appeal the probate court's August 19, 2015 Order rejecting the contentions asserted in his Supplemental Objections. However, the court's ruling filed that date did not fully resolve the Petition. Indeed, the only issue resolved was that bifurcated from the Petition for determination in advance of all other issues (with the intention of aiding the parties in settling all of those other issues in a then-scheduled mediation session).

The August 19, 2015 Order is a clear example of an order on a bifurcated issue, leaving all other issues presented by the Petition for later determination. The petition that resulted in Raymond's eventual filing of his Supplemental Objections (the Petition) presented a host of issues – and all but one remained for determination once the August 19 Order 2015 was issued. As the order listed in this notice of appeal did not resolve all issues presented in the Petition, no appeal lies from it, and this appeal must be dismissed.

3.     Denials of the Motions for New Trial

Raymond filed two motions for new trial, the first concerning the August 19, 2015 Order and the second concerning the October 23, 2015 Order.

There are two reasons why the appeals from the denials of the two motions for new trial are unavailing. First, a motion for new trial is premature if it is made before all issues have been tried. (*Cobb v. University of So. California* (1996) 45 Cal.App.4th

18

1140, 1144; see Cal. Rules of Court, rule 3.1591(c).) Thus, in *Ruiz v. Ruiz* (1980) 104 Cal.App.3d 374, a notice of intention to move for new trial served and filed before the completion of trial of all issues presented was held to be premature and void. (*Id.* at pp. 378-379; *Cobb,* at p. 1144; *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120, 132.)

Because the motion for new trial in this case denied on October 30, 2015, sought review of the August 19, 2015 Order on a bifurcated issue, it is fatally flawed for reasons discussed, *ante*.

Second, that motion for new trial and the second motion for new trial filed to challenge the October 23, 2015 Order, in which the probate court did finally resolve all of the issues presented in the Petition, suffer an additional, shared defect: The *denial* of a motion for new trial is not appealable. Rather, such a ruling is reviewable on appeal from the underlying judgment. (See Code Civ. Proc., § 904.1, subd. (a)(2); *Walker v. County of Los Angeles Metropolitan Authority* (2005) 35 Cal.4th 15, 18-19, citing *Rodriguez v. Barnett* (1959) 52 Cal.2d 154, 156; *Hamasaki v. Flotho* (1952) 39 Cal.2d 602, 608.)

4. The Motion to Vacate the August 19, 2015 Order

Raymond's Motion to Vacate the August 19, 2015 Order suffers from the same defect as his motion for new trial based on the order of that date: The motion is directed to a bifurcated order rather than a final judgment. While the statutory basis for the motion to vacate is Code of Civil Procedure section 663 rather than Code of Civil Procedure sections 656 and 657 applicable to motions for new trial, the two motions have in common that they can only be made once a judgment is entered. (E.g., *Glen Hill*

19

*Farm LLC v. California Horse Racing Bd.* (2010) 189 Cal.App.4th
1296, 1301.)

               5.      <u>The Motion to Vacate the October 23, 2015</u>
<u>Order</u>

Raymond's Motion to Vacate the October 23, 2015 Order
addresses the denial of his motion to vacate the Order entered by
the probate court that date and as to which Raymond has filed a
valid appeal (discussed, *ante*).

The denial of a motion to vacate a *judgment* is appealable
in the same manner as a judgment or order such as that filed
October 23, 2015. It is not treated like the denial of a motion for
new trial. (*Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 130, 133
[order denying motion to vacate is appealable even though the
same grounds may be urged on an appeal from the judgment];
9 Witkin, Cal. Procedure (5th ed. 2008) Appeal § 200, pp. 275-
277.) However, there is older authority that suggests that there
is no appeal from denial of a motion to vacate an order (as
distinct from a judgment), at least when application is made
pursuant to Code of Civil Procedure section 473. (E.g., *In re
Rouse's Estate* (1957) 149 Cal.App.2d 674, 679-680.) We need not
resolve this issue because the appeal from the denial of the
motion to vacate the October 23, 2015 Order raises the same
issues as may be raised in an appeal from that order, and as to
which Raymond has filed a timely appeal.[15]

---

[15]    Raymond presents no argument specifically directed to the
denial of this motion, likely because of the identity of issues
presented as noted in the text accompanying this footnote.

That Raymond's notice of appeal on this basis was
premature (as it was filed prior to the probate court's relevant
ruling on January 7, 2016), is not fatal. (*Estate of Haviside*

6.      The February 4, 2016 and May 2, 2016 Notices of Appeal

In his notices of appeal filed February 4, 2016, and May 2, 2016, Raymond seeks our review of the probate court's awards of attorney fees and costs to Robert and Jenifer, based on orders awarding fees to them on January 7 and March 18, 2016, and the award of such fees and costs to Richard on January 7, 2016. These awards were made based on a provision in the 2014 Settlement Agreement and are proper subjects of appeal based on that contract.[16]

---

(1980) 102 Cal.App.3d 365, 368 [premature filing of such a motion does not deprive the appellate court of jurisdiction to hear it].)

[16]      In his notices of appeal of these orders, Raymond relies on Probate Code sections 1300, subdivisions (b), (c) and (e) and section 1304, subdivision (a).  While we agree these orders are appealable, in our view the source of that authority arises from the circumstance that what the moving parties sought was enforcement of a contractual provision for fees contained in the 2014 Settlement Agreement.  Such an appeal is authorized by Code of Civil Procedure section 904.1, subdivision (a)(2).  The probate court had jurisdiction to entertain these motions under "the broad *equitable* powers that a probate court maintains over the trust within its jurisdiction" rather than "under [its] *supervisory* power." (*Rudnick v. Rudnick* (2009) 179 Cal.App4th 1328, 1333, citing *Hollaway v. Edwards* (1998) 68 Cal.App.4th 94, 99, original italics.)  In addition, it has concurrent jurisdiction with the civil court over actions and proceedings.  (Prob. Code, § 17000, subd.(b).)  We make this distinction as the amounts awarded are not chargeable against the Trustee.

21

## II. RAYMOND DID NOT WAIVE BELOW THE ALLOCATION ARGUMENT HE ASSERTS ON APPEAL

Raymond contends a proper construction of the Trust and principles applicable to its funding require that he be allocated all of the appreciation in the value of the Ranch from the date of Arthur's death and that the probate court erred in determining he had waived this contention.

The Trustee contends Raymond did not argue in the probate court that "the post-death appreciation of the ranch should not count against his 35 percent [residuary] share," and that Raymond cannot argue for the first time on appeal that he should be credited with all of the postdeath appreciation in the Ranch. However, in an effort to explain the basis for its contention on appeal, the Trustee mixes concepts in a way that does not clearly state Raymond's position, either in the probate court or on appeal.

Raymond correctly summarizes what occurred below: "As accounted for by [the Trustee], Raymond received no benefit from the inclusion of [the] Ranch in his 35% interest [in the residue] that he would not have received had [Arthur] just left [the] Ranch to the Trust generally.[17] But [Raymond] was saddled with 100% of the tax burden."

Raymond's principal argument to the probate court was that the gift of the Ranch was a *residuary gift* under Probate

---

17    As we shall discuss, *post*, Raymond errs:  Arthur designated the Ranch *as a means of funding* his residuary gift to Raymond, rather than as a separate, specific gift to him.

22

Code section 21117, subdivision (f);[18] as such, all of the postdeath appreciation, in addition to all of the taxes and expenses attributable to the operation and sale of the Ranch, properly would have been allocated among all of the siblings; *but that, if it were a specific gift*[19] – as the probate court ultimately ruled:  (1) the taxes and expenses for the Ranch should be allocated to him alone, *and* (2) he also is entitled to all of the postdeath appreciation in the Ranch.[20]

To overcome the Trustee's claim that he may not now advance this argument, Raymond further argues that on appeal he seeks "the proper application of the consequences of the classification of the gift of the ranch as a specific gift to the undisputed facts."[21]  Thus, Raymond contends he is arguing a theory on appeal, which, albeit new, presents only a purely legal question, and one resulting from what he also claims is a partially flawed determination by the probate court.  He may do

---

[18]     Probate Code section  21117, subdivision (f) provides:  "A residuary gift is a transfer of property that remains after all specific and general gifts have been satisfied."

[19]     Probate Code section 21117, subdivision (a) provides:  "A specific gift is a transfer of specifically identifiable property."

[20]     The appreciation in the value of the Ranch between the date of Arthur's death and the sale date was significant:  during that period, the Ranch nearly doubled in value.

[21]     We also reject the Trustee's argument that Raymond's present contention was waived during argument in the probate court on July 13, 2015.  Raymond's argument on appeal is different, for reasons described in this section of this opinion.

so. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [appellate court may address purely legal questions presented for the first time on appeal when no factual determinations are required]; *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [same].)

## III.   RAYMOND'S OBJECTIONS WERE NOT BARRED BY PROBATE CODE SECTIONS 16463 AND 16465

The Trustee contends the probate court correctly concluded that Probate Code sections 16463 and 16465 barred Raymond's Supplemental Objections.  In support of that ruling, the Trustee points out it kept Raymond informed it was allocating the Ranch to a subtrust created for him, and expenses of Ranch operations and, most significantly, the income tax due for the sale of the Ranch, would be taken from that subtrust; Raymond never objected; and his counsel had sent the Trustee a spreadsheet which contained data consistent with the Trustee's proposed actions.  The Trustee also argues neither Raymond nor his counsel had objected to this treatment until April 2015, when he filed his Supplemental Objections.

Raymond argues these statutes do not apply to his Supplemental Objections, and his Supplemental Objections are directed to the accounting and allocations which the Trustee has made and proposes to make to the Blech Children and not to anything that occurred in connection with the sale of the Ranch.[22]

---

[22]    Although the Trustee argues the substantial evidence test is to be used to analyze this issue, our review is de novo, as we are discerning the meaning of statutes on undisputed facts. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

24

Probate Code section 16463 provides in part: "(a) Except [in circumstance not relevant in the present case], a beneficiary may not hold the trustee liable for an act or omission of the trustee as a breach of trust if the beneficiary consented to the act or omission before or at the time of the act or omission." And, Probate Code section 16465 provides in part: "(a) Except [in circumstance not relevant in the present case], if the trustee, in breach of trust, enters into a transaction that the beneficiary may at his or her option reject or affirm, and the beneficiary affirms the transaction, the beneficiary shall not thereafter reject it and hold the trustee liable for any loss occurring after the trustee entered into the transaction."

Raymond agrees he consented to the sale of the Ranch, pointing out his objections instead are to the accounting which the Trustee petitioned the probate court to accept. Thus, Raymond is raising a difference of opinion regarding an accounting matter; he is not alleging a breach of trust by the Trustee. The remedy, if Raymond's objection to the accounting petition is successful, is to change specified allocations among the various trusts, i.e., to require the Trustee to comply with Raymond's view of the proper funding of the gifts to the Blech Children, not to hold the Trustee liable for damages or to obtain restitution from it. Thus, Probate Code section 16463 has no application to the present dispute. Nor do Raymond's actions come within the issues addressed in section 16465, as Raymond has no objection to the manner of sale of the Ranch or to the sale price; indeed, he freely admits he encouraged and advocated that sale. For these reasons, the probate court erred in finding these sections applicable, and this argument by the Trustee is without merit.

25

## IV.   RAYMOND IS NOT ESTOPPED FROM ASSERTING HIS OBJECTIONS TO THE TRUSTEE'S ACCOUNTING

Raymond contends the probate court erred in determining he "both consented to and affirmed [the Trustee's] treatment of the [gift of the Ranch], and the other Beneficiaries relied upon Raymond's actions, and Raymond is thus estopped from now challenging that treatment."

Establishing an equitable estoppel is dependent upon proof of four elements:  "(1) the party to be estopped must know the facts; (2) the estopped party must intend that his conduct shall be acted upon or must act in a way that causes the other party to believe that was his intent; (3) the party asserting estoppel must be unaware of the true facts; and (4) he must detrimentally rely on the other party's conduct.  (*Estate of Bonanno* (2008) 165 Cal.App.4th 7, 22.)  If an estoppel is established, the estopped party is deprived of applicable rights or defenses.  (*Ibid*.)  While estoppel generally is a question of fact, if the facts are undisputed and only one reasonable conclusion can be drawn from them, it becomes a question of law.  (*Ibid*.)"  (*Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1106.)

As the facts relevant to analysis of this issue in this case are undisputed, we determine the matter de novo.  (*People ex rel. Lockyer, supra*, 24 Cal.4th at p. 432.)  In making this determination, we observe that the doctrine of equitable estoppel is based on principles of equity and fair dealing and provides that a person may not deny the existence of a state of facts if that person had intentionally led others to believe a particular circumstance to be true and to rely upon that belief to the detriment of the other party.  (*Lantzy v. Centex Homes* (2003) 31

26

Cal.4th 363, 383; *City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 239-240.)

In this case, the argument that Raymond has led his siblings to rely on his actions to their detriment is unconvincing. There are no facts that he encouraged any of his siblings to take any action on his or her own behalf; all had the same access to information and Raymond was entirely focused on his own interests. Also, the key document relied upon in support of the claim that Raymond is estopped is a spreadsheet containing estimates of allocations among the beneficiaries prepared by the Trustee, not Raymond. Further, each of the versions of this spreadsheet is headed with the statement that it is "For Discussion Purposes – Not Final Calculations and May Not Be Relied Upon for Any Purposes." All of the Blech Children received the same information and all had the same access to the Trustee. [23]

While one might argue the spreadsheets put the beneficiaries on notice of what was *likely* to occur with respect to the ultimate distribution of assets, doing so truncates the statutory process of petitions for accountings. That statutory process is replete with requirements for disclosures and accuracy in its financial schedules. Holding that any beneficiary is estopped from asserting a contention with respect to, e.g., an accounting spreadsheet once a petition for accounting is filed on the basis that the beneficiary did not object to a prefiling version

---

[23] During oral argument, it was pointed out that another spreadsheet had been distributed six months earlier which also included estimated amounts to be allocated subject to verification of certain information and conclusion of pending transactions. It did not have the quoted qualifying language.

of the document actually filed, deprives each beneficiary who received the earlier version of the protections provided by the statutory requirements for accountings and is inequitable.  Thus, the circumstance that the Trustee circulated preliminary calculations to which no objection was made does not estop any recipient to later argue a position based on the final version of an accounting even if it was also discernable in a "For Discussion Purposes" version of that accounting.  It is the filing of the petition for accounting that compels a party desiring to present any opposition to it to do so.

Nor was Raymond's conduct inconsistent with the legal position he was then arguing that was predicated upon the Ranch being a residuary gift.

The arguments which the siblings make are based on what they perceive to be a contradiction between Raymond's silence during the sale of the Ranch on the one hand as to issues other than its sale, and Raymond's objections to the accounting first asserted once the Trustee filed its petition, on the other.  However, until Raymond was served with the Petition he was under no obligation to assert his legal contentions.

Further, the circumstance that the Trustee serves as trustee precludes it from making an argument based on estoppel.  Its role vis-à-vis the parties is to be neutral – fair and accurate.  It has made no argument that it has been prejudiced by Raymond's conduct.  And, it would be inequitable to allow it to defeat Raymond's challenge to its petition for accounting based on Raymond's actions that resulted in part from the preliminary financial presentations it uttered.  (See *Drake v. Pinkham* (2013) 217 Cal.App.4th 400. 406.)

We conclude that the probate court erred in finding Raymond was estopped by his conduct from challenging the Trustee's petition for approval of its first accounting.[24]

## V.   THE RELEASE

The probate court determined Raymond's execution of the 2014 Settlement Agreement released the objections he made in his Supplemental Objections.  Raymond contends that ruling was error, arguing the express terms of his agreement with his siblings allowed his later-filed Supplemental Objections.  His siblings dispute his contention, arguing the release contained in the 2014 Settlement Agreement bars Raymond from making any objection to the accounting in the Petition notwithstanding that it was filed by the Trustee after the date of execution of the release.[25]  We conclude that, although it is broad in scope, the

---

[24]    The siblings' claim that Raymond's contentions are barred by the doctrine of laches also fails.  An essential element of that claim is prejudice (e.g., *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624).  The siblings have made no such showing.  Their claims that they each would be required to return more than $1 million to the Trust to be reallocated are not supported by citations to the record.  We therefore do not credit them.  (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239; *Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 796.)

[25]    The Trustee "joins" in the arguments advanced by the siblings, relying on California Rules of Court, rule 8.200(a)(5).  Raymond argues the Trustee does not have standing to address this issue because it was not a party to the 2014 Settlement Agreement and, as trustee, it is "obligated to deal impartially with all the Beneficiaries (Cal. Probate Code § 16003)."  Because the Trustee advances no distinct argument on this issue, and we

29

release did not preclude any of the Blech Children from filing objections to the accounting presented in the Petition.

## A.    Additional facts

The Blech Children executed the 2014 Settlement Agreement as of August 27, 2014.  Raymond signed on his own behalf and as Executor of the estate of Arthur Blech.  His siblings signed as individuals.  All of the siblings were represented by counsel, each of whom also signed "as to form."

We focus our discussion on those paragraphs of the 2014 Settlement Agreement which bear directly on the issue to be resolved.  Eight "Recitals" precede the 31-paragraph "Agreement."  Recital G states that "Each Blech Beneficiary agrees and acknowledges that he/she has a right to seek a Court order charging certain expenses of administration of the Estate or Trust (including legal fees) against another party's share of the Trust ('Charging Claims').  The parties agree that all rights relating to the Charging Claims through the date of this Agreement are resolved and released pursuant to the terms and conditions of this Agreement except for the right to object to certain actions related to specified probate matters.

The first paragraph of the body of the Agreement incorporates the Recitals "into this Agreement as set forth in full."  Paragraph 2 provides the terms of the Agreement "govern and control" in the event of "any conflict, inconsistency, or incongruity, between any provision of this Agreement and any provision of the Will or Trust . . . ."  Paragraph 4 directs certain

_____

resolve it adversely to those who advocate it, we do not otherwise address the Trustee's purported joinder.

30

siblings to order the Trustee to make specified payments to other siblings.

Paragraph 5, headed "Estate Proceeding," contains five lettered subparagraphs, addressing the resolution of debts owed to the estate, dismissal of actions concerning Raymond's actions as executor, and resolution of contentions regarding estate tax and income tax returns for the estate.

Paragraph 6 contains nine "Instructions to Trustee" in which the Blech Children "collectively and unanimously instruct" the Trustee to do certain things, mostly consisting of payments to a particular sibling or to account for an expenditure by or on behalf of a sibling in a particular way, including the following:

"All transactions set forth in the Executor's First Account shall be treated as expenses of Estate administration," rather than being charged to any of the Blech Beneficiaries. The expenses to be so treated include "expenditures for the benefit of the 3,050 acre ranch" that Robert, Jenifer and Richard allege have "benefited Raymond personally. . . ." (¶ 6(b).)

"The cost of roof repair to Jenifer's Montana residence (in the amount of $13,025.00) shall be an expense of Trust administration, and shall not be charged against [her] share of the Trust." (¶ 6(c).)

Provide the Blech Children with statements of the Trustee's trustee and legal fees and work with them "to resolve, without litigation," the amount of such fees. The Blech Children reserve to themselves the right to challenge the Trustee's "trustee and legal fees." (¶ 6(g).)

In paragraph 7, the siblings "agree and acknowledge that the material purposes and considerations for the resolutions reached . . . are to (i) preserve Estate and Trust resources, (ii)

31

avoid litigation and trial on the Executor's First Account, and (iii) close the Estate and terminate the Trustee as soon as possible."

Paragraph 8 states that "This Agreement shall be enforceable as among all of the parties [and] [t]he Court in the Estate Proceeding shall retain jurisdiction to enforce the terms of this Agreement that are related to the Estate . . . ."

Paragraph 10 contains the parties' mutual releases. With certain exceptions, including those set out in paragraph 12 (see discussion, *post*), the parties release each other and all persons and entities related to any of the parties from all past or present claims "of whatever kind or nature," "whether known or unknown, suspected or unsuspected, anticipated or unanticipated, that any or each of them had, has, or might have arising out of or in any way related to the Trust, Trust Proceeding . . . or any other claims or issues related thereto."

Paragraph 11 sets out the release of unknown claims, which is total *except for specified matters*. One of the matters as to which there is no release of unknown claims concerns "the parties' *rights against [the Trustee] or any successor trustee" as set out in paragraph 12*. [26] (Italics added.)

_____

[26] The release, in reliance on Civil Code section 1542, expressly "acknowledge[s] and agree[s] that [the Blech Children] are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, as to the matters released herein." The parties also warranted that "it is the intention of the parties, and each of them, through this release to fully, finally and forever release all such matters, and claims related thereto, which do now exist, may exist or heretofore have existed." Their releases were to "remain in effect as a full and complete release of such matters, notwithstanding

32

Paragraph 12 states: "Nothing in this Agreement, whether express or implied, including but not limited to the provisions of Paragraph 10 (Mutual Releases) of this Agreement, is intended to confer third-party beneficiary status or to confer otherwise any rights to [the Trustee] (or any successor trustee) . . . . *Nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any undersigned party to this Agreement.* Nor shall any provision hereof afford any third party any right of subrogation, indemnity, contribution, set-off or action over against any party to this Agreement." (Italics added.)

In paragraph 13, the parties acknowledge each was represented by counsel or had the opportunity to consult with counsel. This representation is confirmed by the signature pages of the Agreement which contain the signatures of counsel for each of the Blech Children "as to form."

### B. Discussion

Raymond's siblings make several preliminary arguments before focusing on their principal contention, that the release in the 2014 Settlement Agreement bars Raymond from making the claims he asserts in his Supplemental Objections and on appeal. The siblings do not support any of these preliminary claims with authority, however, and they include in this section of their brief facts not admitted by the probate court at the July 2015 hearing. They also acknowledge that those claimed facts were excluded. As there is neither legal authority nor citation of facts admitted into evidence below to support these preliminary arguments, we

---

the discovery or existence of any additional or different claims or facts relating thereto."

Notwithstanding this broad language, there is an exception to its scope, as is now discussed in the text of this opinion.

33

do not consider them. (*Harding v. Harding* (2002) 99 Cal.App.4th 626, 635; *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 948 [brief without legal argument and citation to authorities on the points made may be treated as waived or abandoned]; *City of Lincoln v. Barringer, supra,* 102 Cal.App.4th at p. 1239 [contentions unsupported by citation to relevant facts are disregarded on appeal].)

The parties agree the 2014 Settlement Agreement is a contract, and that we determine its meaning by application of well-established principles applicable to the construction of contracts. Thus, our review is de novo; we exercise our independent judgment as to the meaning of the 2014 Settlement Agreement because "[i]t is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence. . . . [Thus, we endeavor] to effectuate the mutual intent of the parties as it existed at the time of contracting insofar as it is ascertainable and lawful." (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 70-71.)

" 'Where the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone.' [Citations.] 'Contract formation is governed by objective manifestations, not the subjective intent of any individual involved. [Citations.] The test is "what the outward manifestations of consent would lead a reasonable person to believe." ' " (*Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1277.) "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166.) Thus, in interpreting the contract under review, we are

not concerned as much with what the parties might tell us they meant by the words they used as with how a reasonable person would interpret those words.

Of equal importance is the rule that " '[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.' (Civ. Code, § 1643; see also *id., § 3541*.)" (*People v. Parmar* (2001) 86 Cal.App.4th 781, 802.)

Finally, we note that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "[E]ven if one provision of a contract is clear and explicit, it does not follow that that portion alone must govern its interpretation; the whole of the contract must be taken together so as to give effect to every part." (*Alperson v. Mirisch Co.* (1967) 250 Cal.App.2d 84, 90.) " 'An interpretation which renders part of the instrument to be surplusage should be avoided.' (*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730.)" (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 799.)

There is no doubt:  the mutual releases contained in paragraph 10, and the mutual releases of unknown claims set out in paragraph 11, are broad and encompassing.  It is equally clear that there are certain exceptions to these releases, including as relevant to the present matter, the exception from their scope "as set forth in . . . paragraph 12."  These exceptions include the reservation of the parties' rights against the Trustee, specific exceptions to the releases stated in paragraph 10, as well as

35

exceptions to the breadth of the release of unknown claims set out in paragraph 11.

With specific reference to Raymond's argument, paragraph 12 includes the following limitation on the scope of other provisions that would – without it – adversely affect Raymond's claim: "Nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any undersigned party to this Agreement."

Raymond argues that the probate court's decision that his Supplemental Objections were released in this document is deficient in three respects: it "is not supported by the express terms of that agreement, [it] is not supported by the circumstances surrounding that agreement, and [it] ignores that the objections were to an Accounting Petition that was first filed some two months *after* the [2014 Settlement Agreement]."

The siblings rely on the release of unknown claims contained in paragraph 11 to support their attempt to validate the probate court's ruling. In doing so, the siblings argue "Robert and Jenifer [with joinder by Richard] have never contended that [Raymond] gave up all rights to challenge [the Trustee's] accounting, or even to seek surcharges against [the Trustee] . . . . He did, however, give up rights to impose costs on his siblings or their subtrusts."

The first difficulty with the siblings' argument is that there is no evidence a consequence of Raymond's argument would be to impose costs on his siblings. Although the siblings make this claim, the facts upon which they base it were not admitted below and we therefore do not consider them or the argument predicated upon those "facts."

36

The siblings' second argument is that the scope of the waiver of claims under Civil Code section 1542 is so broad as to preclude Raymond's claims. In this regard, they point to the text of paragraph 11, in particular, to the section providing the signers of the 2014 Settlement Agreement specifically "acknowledge and agree . . . that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, as to the matters described herein," as well as to other similar language.

What they do not do is consider the express limitations on the scope of that release which we have set out, *ante*, which appear both in paragraph 11 and in paragraph 12 (e.g., the provision in paragraph 12 stating: nothing "in this Agreement [is] intended to relieve or discharge the obligation or liability of any third party to any undersigned party to this Agreement"). [27]

---

[27] The siblings do concede that the release does not bar Raymond from challenging an action *by the Trustee*, but only so long as *they are not adversely affected* should he prevail.

The siblings also contend Raymond's claim is without merit based on the circumstance that the probate court rejected his proffer of evidence of his intent in signing the Settlement Agreement. Their claim is without persuasive force, as Raymond's subjective intent is not relevant to either court properly construing the document. Further, we construe the document according to the rules articulated in the text, *ante*; i.e., we give the document a reasonable construction based on all of its provisions rather than on the subjective intent of any of the parties. (*M &F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1530 [" ' "It is the outward expression of the agreement, rather than a party's unexpressed

37

Thus, their references to the text of the 2014 Settlement Agreement are unduly selective, resulting in a fatal flaw in their argument.

Notwithstanding the siblings' factually unsupported argument that were Raymond to prevail in his Supplemental Objections his siblings would be adversely affected, we are bound to construe all of the terms of the 2014 Settlement Agreement together, rather than give greater weight to one provision over another, if possible: our obligation is to construe the document *as a whole*. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 391.)

So construing the document, the siblings' reliance exclusively on the broad release language ignores the limitation on the breadth of that release. It must also be noted that this exception applies so that any of the Blech Children may file objections to the Trustee's accounting. Raymond did exactly that – and he was not the only sibling to do so. Robert and Jenifer also filed objections to the Petition, albeit on other grounds. Thus, the siblings' argument becomes: We, the siblings may challenge the Trustee, but Raymond may not do so. We find the siblings' claim to be without merit.

## VI. CONSTRUCTION OF THE RESIDUARY BEQUEST AND ALLOCATION OF APPRECIATION IN VALUE OF THE RANCH

Between the time of Arthur's death and the sale of the Blech Ranch, its fair market value increased from $7.2 million to $14 million, at which price the Ranch was sold. The proceeds of the sale were allocated to Raymond's subtrust and the income

---

intention, which the court will enforce," ' " quoting *Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 755.].)

taxes on the sale of the Ranch, $2.3 million, were paid from that source.[28]  The probate court ruled that this allocation of tax liability was correct and that it was proper to use the $14 million valuation in allocating the remainder of the assets of the Trust among all of the Blech Children in accord with their percentage shares of the residue of the Trust.

Raymond contends the value of the Ranch should have been allocated based on its date-of-death value (with Raymond receiving the entire net proceeds of its sale, including the appreciation in the value of the Ranch following Arthur's death) based on the probate court's ruling that "The gift of Blech Ranch to Raymond Blech was not a residuary gift under California Probate Code § 21117(f)."[29]

Raymond's argument in support of this claim is that the probate court's ruling that the Ranch was not a residuary gift meant that it must be valued at its date-of-death value of $7.2 million rather than at its $14 million sale price (as a substitute for its date-of-distribution value).  Thus, Raymond contends the probate court's ruling granting the Trustee's Petition, in which

---

[28]     That Raymond is solely responsible for the income tax on the sale of the Ranch is clearly stated in Article 5.5 of the Trust; its second sentence provides: "Income taxes payable by any subtrust shall be paid by the beneficiary of such subtrust."

[29]     The quoted language is taken from the August 19, 2015 Order.  The same legal conclusion appears in the probate court's December 29, 2015 Statement of Decision, following the filing of the October 23, 2015 Order from which Raymond's appeal is taken.

39

the Ranch was valued for allocation among the siblings at its sale price, was erroneous.

Raymond supports his argument using the term "specific gift," and, although the probate court did not use that term in its ruling, it is an acceptable shorthand to analyze Raymond's contention. If Raymond were correct, he would be the sole distributee of the $4.5 million net proceeds of the sale of the Ranch (the difference between the sale price of $14 million and the sum of $7.2 million [the valuation of the Ranch on the date of Arthur's death] and the $2.3 million in taxes paid])—and would *additionally* share in 35 percent of the remainder of the Trust estate.[30]

On appeal, we review the probate court's ruling, not its reasons, and affirm if the ruling is correct albeit the reasons are not; we also resolve any ambiguities in favor of affirmance. (See, e.g., *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness."]; *Munoz v. Olin* (1979) 24 Cal.3d 629, 635-636.)

The probate court's characterization of this gift (and of all gifts made in the Trust) was a legal determination on undisputed facts which we review de novo. (*People ex rel. Lockyer v. Shamrock Foods, supra,* 24 Cal.4th 415, 432; *Lozada v. City and County of San Francisco* (2006) 145 Cal.App.4th 1139, 1145.) As we now discuss, that characterization was in error, but, once corrected, it does not alter the probate court's determination to

---

[30] The actual amounts would be slightly different when costs of sale and expenses of operation of the Ranch are included.

value the Ranch at its sale price in determining the distribution of the remainder of the Trust (including in the amount to be distributed the net proceeds from the sale of the Ranch) among the Blech Children.[31]

### A. Lexicon of gifts

A revocable living trust such as that under review in this case contains transfers to be effective on the death of the settlor. Such transfers are statutorily described as "at-death transfers." (Prob. Code, § 21104.) The Probate Code provides for six types of

---

[31] We raised this issue with the parties in advance of oral argument, offering each an opportunity to submit a letter brief on this issue. The issue was also addressed at oral argument. Our determinations in this opinion include consideration of the parties' written and oral views.

We address the proper construction of the terms of the Trust as it involves an issue of law to be decided in this case on undisputed facts. Such matters may be raised for the first time on appeal. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [appellate court may address purely legal questions presented for the first time on appeal when no factual determinations are required]; *Ward v. Taggart* (1959) 51 Cal.2d 736, 742 [same].) And, as we held in *Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1341, footnote 6, it makes no difference that the issue is first raised on appeal by the court rather than the parties, as long as the parties have been given a reasonable opportunity to address it. (Accord, *Barton v. New United Motor Manufacturing, Inc.* (1996) 43 Cal.App.4th 1200, 1207.) We may also do so because Raymond's theory on appeal requires that we interpret the terms of a written instrument (as well as the text of statutes), and there is no question of fact presented, only a question of law. (*Palmer v. Shawback* (1993) 17 Cal.App.4th 296, 300.)

"at-death transfers": "(a) A specific gift is a transfer of
specifically identifiable property. [¶] (b) A general gift is a
transfer from the general assets of the transferor that does not
give specific property. [¶] (c) A demonstrative gift is a general
gift that specifies the fund or property from which the transfer is
primarily to be made. [¶] (d) A general pecuniary gift is a
pecuniary gift within the meaning of Section 21118.[32] [¶] (e)
An annuity is a general pecuniary gift that is payable
periodically. [¶] (f) A residuary gift is a transfer of property that
remains after all specific and general gifts have been satisfied."
(Prob. Code, § 21117.)

We observe, however, that while the parties and the
probate court directed their analysis of the terms of the Trust to
discuss application of these several types of postdeath transfers,
to properly construe the terms of the Trust we must acknowledge
the terms of Probate Code section 21102. That section provides:
"(a) The intention of the transferor as expressed in the
instrument controls the legal effect of the dispositions made in
the instrument. [¶] (b) The rules of construction in this part [of
the Probate Code] apply where the intention of the transferor is
not indicated by the instrument."[33] (Cf. Probate Code § 16335,

_____

[32] Section 21118, subdivision (b) defines a pecuniary gift as "a
transfer of property made in an instrument that either is
expressly stated as a fixed dollar amount or is a dollar amount
determinable by the provisions of the instrument."

[33] Probate Code section 21102, subdivision (c) provides:
"Nothing in this section limits the use of extrinsic evidence, to the
extent otherwise authorized by law, to determine the intention of
the transferor." As we discuss in the text, the only extrinsic

42

subd. (a)(1), which requires that the terms of the particular dispositive plan be carried out even when they differ from that which would otherwise be called for under a statute.)

We also consider in construing the terms of the Trust, Probate Code section 21121, which provides, "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole. If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument." And, Probate Code section 21122 advises: "The words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained. Technical words are not necessary to give effect to a disposition in an instrument. Technical words are to be considered as having been used in their technical sense unless (a) the context clearly indicates a contrary intention or (b) it satisfactorily appears that the instrument was drawn solely by the transferor and that the transferor was unacquainted with the technical sense."

The common law provides additional guidance: "The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict therein. [Citations.]" (*Burch v. George* (1994) 7 Cal.4th 246, 254; see *Tunstall v. Wells* (2006) 144 Cal.App.4th 554, 561 [same]; see Prob. Code, § 21102, subd. (c).) Our Supreme Court has explained: "Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a

_____

evidence in the record in this case is the drafting attorney's memorandum. (See, footnote 34, *post*.)

43

meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. [Citations.] It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; see *Gardenhire v. Superior Court* (2005) 127 Cal.App.4th 882, 888.)

In the case of undisputed evidence but conflicting inferences, we apply the following standard of review: "[W]here the evidence is undisputed and the parties draw conflicting inferences, [the appellate court] will independently draw inferences." (*City of El Cajon v. El Cajon Police Officers' Assn.*, *supra*, 49 Cal.App.4th at p. 71; see *Parsons v. Bristol Development Co., supra,* 62 Cal.2d at p. 866, fn. 2.) As noted, *ante*, Probate Code section 21121 requires that we construe all parts of the instrument in relation to the others to form "a consistent whole." And, if the meaning of any part of an instrument is ambiguous or doubtful, "it may be explained by any reference to or recital of that part in another part of the instrument." (*Ibid*.; see *Colburn v. Northern Trust Co.* (2007) 151 Cal.App.4th 439, 448, fn. 6; *Siegel v. Fife* (2015) 234 Cal.App.4th 988, 996.)[34]

We observe that, applying these principles, this district has previously held that there "is no substantial difference between

---

[34] The memorandum, dated January 18, 2011, prepared by the lawyer who drafted the Trust characterizes article 5.4 as applying to the "Division of the Remaining Trust Estate"; thus, the lawyer who drafted the Trust viewed article 5.4 in the same manner as we describe it in the body of this opinion, i.e., as dividing the remainder, or residue, of the estate.

44

the words 'remainder' and 'residue,' " and that "in construing a will [or a trust] the aim is to ascertain the meaning of the testator [or settlor] rather than the meaning of the words used." (*Estate of Moorhouse* (1944) 64 Cal.App.2d 210, 214-215.)

### B. Structure and Terms of the Trust

The principal dispositive provisions of the Trust are set out in its article 5. After gifting his personal effects to his children "in such manner as they mutually agree" (art. 5.2), and making specific pecuniary gifts to family members and others (art. 5.3), Arthur directed the disposition of the remainder of his trust estate in a separate paragraph, headed "Division of Remaining Trust Estate" (art. 5.4), as follows: "As soon as reasonably practicable after the death of Grantor and after distributions, if any, pursuant to the provisions of Paragraphs 5.2 and 5.3, and further subject to the provisions of this Paragraph, the Trustee shall divide the remaining Trust estate into separate shares as follows. . . ." In the next four subparagraphs, Arthur allocated the "Remaining Trust Estate" – by percentages – to his four children, subject to certain adjustments for outstanding loans, and in the case of Jenifer and Raymond, the direction to include in that child's share "any interest that Grantor or this Trust directly or indirectly owns in [described real property] . . . ."

Article 5.5 provides: "All estate taxes payable by this Trust shall be paid by the beneficiaries listed in Paragraph 5.4 above in direct proportion to their respective percentage shares. Income taxes payable by any subtrust shall be paid by the beneficiary of such subtrust."

Cash flow was to be distributed to each beneficiary quarterly from his or her share. (Art. 5.6.) Finally, the principal given to each beneficiary was to be distributed to that beneficiary

45

over 10 years, beginning on the first anniversary of Arthur's death.  (Art. 5.7.)

In construing the terms of the Trust, as noted, we seek to ascertain the grantor's intent by the language of the document as of the time he signed it.  (*Estate of Helfman* (1961) 193 Cal.App.2d 652, 655.)  Each case depends upon its particular facts.  (*Ibid.,* citing *Estate of Henderson* (1911) 161 Cal. 353, 357.)

C.  **Discussion**

We do not agree with the probate court's ruling that the instruction in article 5.4 that Raymond's 35 percent share was to include the Ranch made it "not a residuary gift."[35]  Because the division directed by article 5.4 was to be made only after all other gifts have been made, it is clear that article 5.4 was intended to dispose of the remainder (or residue) of Arthur's estate.  Gifts which are made from the assets which remain in an estate are gifts of remainder or residuary interests.  This end-stage funding is entirely consistent with Probate Code section 21117, subdivision (f), which states:  "A residuary gift is a transfer of property that remains after all specific and general gifts have been satisfied."  It is also consistent with the case authority cited, *ante*.

Most importantly, our construction of article 5.4 carries out the "intention of the transferor as expressed in the instrument . . . ."  (Prob. Code, §21102, subd. (a).)  Had Arthur intended the gift of the Ranch to be a specific gift, he had the mechanism to so designate it.  Indeed, he had made such a gift to Raymond in article 5.3; there, he gave Raymond a specific gift, also of real

---

[35]    The probate court reached a similar conclusion as to the Montana property allocated to Jenifer's share.

46

property, i.e., of the house and land that adjoined the Ranch, using the following language:  "(e) The Trustee shall distribute to RAYMOND that certain real property . . . ."  (We omit the specific legal description of the land given, that included a home adjacent to the Ranch.)  This gift in article 5.3(e) was unconditional and specific (as was a gift of a house to Jenifer, also set out in article 5.3), and was made with no language that is either conditional or equivocal:  Neither gift was dependent on any other event.

By contrast, the "gift" of the Ranch to Raymond in article 5.4 was only a funding mechanism for the actual gift – which was stated as a percentage of the remainder or residue of the Trust estate.  Thus, the gift of the Ranch to Raymond was to occur *only if* at the time of the distribution of the remainder of the trust assets, those assets included the Ranch.  (Art. 5.4(b).)  What was not conditional was that Raymond was to receive 35 percent of the residue regardless of whether the Ranch was part of the Trust estate:  that was a residuary gift to Raymond.[36]

This means of expressing the desire that, *if* the Ranch were in the estate at the date of distribution, *then* it was to be used in funding Raymond's share of the residue, rendered the gift of the Ranch an instruction to the Trustee on that with which to fund the percentage gift which Arthur unequivocally made to Raymond if the Ranch were an asset of the Trust at that time, rather than a mandate that Raymond was to receive the Ranch *as well as* 35 percent of the remainder or residue of assets in the Trust on their distribution.  Such an instruction is entirely

---

[36]    The headings of the two articles of the Trust also suggest a difference in the nature of the gifts made.  Article 5.3 is headed "Specific Distributions" and article 5.4 is headed "Division of Remaining Trust Estate."

consistent with Raymond's long-standing and intense involvement with Ranch operations. One also must consider that Raymond receives a substantially greater percentage of the residue than any other sibling. We would expect that, had Arthur intended Raymond to also receive the entirety of any appreciation in the value of the Ranch, Arthur would have expressly so stated in the Trust.

Setting aside our conclusion that Arthur's intention was to make the gifts of the balance of his estate as discussed above (as expressed in Probate Code section 21102), in the context of Probate Code section 21117 upon which the parties presented their arguments to the probate court, the direction in article 5.4(b) (and in article 5.4(c) with respect to Jenifer) concerns *how to fund* Raymond's percentage share of the remainder or residue and not *what specific property to give*. In the context of section 21117, the gift to Raymond in article 5.4(b) was a gift of a 35 percent share of the residue within the meaning of Probate Code section 21117, subdivision (f), and not a specific gift as defined in subdivision (a) of that statute.

The proper construction of residuary clauses which include reference to specific property of a decedent has been an issue in this state for many years. For example, in 1907, our Supreme Court considered this matter in *In re Painter's Estate*.[37] (150 Cal.

---

[37]     In *Painter's Estate,* the Supreme Court relied in part on Civil Code section 1357, which defined "specific legacy" as follows: "A legacy of a particular thing, specified and distinguished from all others of the same kind, belonging to the testator, is specific; if such legacy fails, resort cannot be had to the other property of the testator." (Former Civ. Code, § 1357, ¶ 1.) (The definition of "specific gift" now is subdivision (a) of Probate Code section

498 (*Painter's Estate*).)  There, our Supreme Court was called upon to determine whether a provision in the codicil to the will of that decedent describing specific properties owned by the decedent were specific gifts and for that reason not chargeable with the payment of general legacies.  (*Id*. at p. 503.)  Because the listing of specific properties to be devised in that will was followed immediately by a statement that those properties were to be given *together with all of the decedent's other property*, the court determined that they were part of the residue rather than specific gifts.  In reaching this determination, our Supreme Court stated:  "In short, the question is purely one of construction.  The

21117.)  Paragraph 4 of former Civil Code section 1357 defined a residuary legacy as follows:  "A residuary legacy embraces only that which remains after all the bequests of the will are discharged."

　　At that time, Civil Code section 1317 provided:  "A will is to be construed according to the intention of the testator."  And section 1318 provided:  "In case of uncertainty arising upon the face of a will, as to the application of any of its provisions, the testator's intention is to be ascertained from the words of the will, taking into view the circumstances under which it was made, exclusive of his oral declarations."  (See, *Estate of Loescher (*1955) 133 Cal.App.2d 589, 593-594 ["Whether a devise is residuary, general, specific or administrative depends upon the intention of the testator as shown by the entire will.  [Citations.]"].)"  The statutory definitions of specific and residuary legacies had not changed significantly from the time of the decision in *Painter's Estate* when *Estate of Loescher* was decided.  (Compare former Prob. Code, § 161, enacted by Stats. 1931, ch. 281, p. 595; and see Historical and Statutory Notes, 52 West's Ann. Prob. Code (2002 ed.) foll. former § 161, p. 129, with Civ. Code, § 1357, extant at the time of the decision in *Painter's Estate*.)

49

testator's intent is to be determined in each case from a consideration of the particular language employed.  A bequest or devise of the residue of an estate is general, because such residue is not ascertainable at the time the will is made.  The fact that, in giving such residue, the testator describes, as included in it or forming a part of it, certain specific property owned by him, does not alter the character of the residuary gift." (*Id*. at p. 507.)

Confirming this reasoning, the court pointed out that a legacy is specific only when, if that property is not vested in the decedent at the time of his or her death, it fails, citing Civil Code section 1357.[38]  (*Painter's Estate,* at p. 505.)

The language of the Trust in this case presents an even clearer statement of the nature of the gift of designated property than in *Painter's Estate*:  the gift here is of 35 percent of the residue, utilizing the Ranch as an asset with which to fund the gift to Raymond in recognition of his long and close association with it, but a 35 percent share nonetheless, even if the Ranch is no longer owned at the time of Arthur's death.

## VII.  ALLOCTION OF ASSETS IN THE RESIDUARY SHARE OF THE TRUST

In resolving Raymond's Supplemental Objections, the probate court validated the Trustee's use of the proceeds from the sale of the Ranch to calculate and to fund the gifts to be made pursuant to article 5.4, including Raymond's 35 percent share.[39]

---

[38]     See footnote 37, *ante*.

[39]     In its August 19, 2015 Order overruling objections, the probate court concluded that the Ranch was to be valued at $14 million for purposes of distribution of the residue to the Blech Children – even though it had erroneously concluded it was a

While we do not agree with the reasoning of the probate court, we reach the same result because, as just discussed, Arthur intended the Ranch merely as a means to fund the gift to Raymond of a 35 percent share of the residue rather than as a separate gift.[40]

In his appeal, Raymond elected to adopt the probate court's flawed analysis that the gift was a specific gift, doing so as the means to overturn the probate court's October 23, 2015 Order and to obtain a determination on appeal that the Ranch was to be valued at its date-of-death value. While we find the probate court's reasoning flawed in part, we are not persuaded by Raymond's arguments that the probate court's conclusion as to date of valuation was in error. As Raymond has presented no other argument warranting reversal, we affirm the probate

specific gift. In that Order, the probate court wrote: "[The Trustee's] treatment of the Blech Ranch gift (including valuation of Blech Ranch at $14 million for purposes of calculating Raymond Blech's percentage interest in other Trust assets . . .), was proper." That valuation was confirmed in its October 23, 2015 Order in the grant of the Petition.

[40] The Trustee advances an additional reason for using date-of-distribution values. Thus, it points out that article 5.7 of the Trust requires that distributions to the siblings are to be made over a 10-year period, and, if Raymond were to die prior to the end of that term, his residuary share is required to be revalued at its then "fair market value" and divided among his remaining siblings. The Trustee then argues that the need for annual revaluations (and for revaluation should Raymond die prior to the end of the 10-year term) supports the Trustee's contention that it was Arthur's intent that the assets distributed in the residue of the estate are to be valued at their fair market value on the several dates of their distribution rather than on Arthur's death.

court's conclusion. (*In re Marriage of Arceneaux, supra*, 51 Cal.3d 1130, 1133 ["A judgment or order of a lower court is presumed to be correct on appeal"]; *Munoz v. Olin, supra,* 24 Cal.3d at pp. 635-636.)

## VIII. ATTORNEY FEES

Robert, Jenifer and Richard sought and were awarded attorney fees, costs and expenses, based on the authorization for recovery of those amounts in paragraph 23 of the 2014 Settlement Agreement. The probate court granted their motions on January 7, 2016, awarding Robert and Jenifer $83,120, and Richard $30,869.24. On March 18, 2016, the probate court awarded Robert and Jenifer an additional $123,331.90.

On appeal, Raymond does not challenge the authority for awarding such fees; nor does he challenge the reasonableness of the fee awards made. Instead, he seeks to reverse these awards only on the basis that he should prevail on the merits of his appellate arguments.[41] As he has not prevailed, and as he has

---

[41] At argument, counsel for Robert and Jenifer argued that Raymond had waived this argument by paying the attorney fee awards and Raymond argued that he did so under compulsion and thus did not waive, relying on *Wisniewski v. Clary* (1975) 46 Cal.App.3d 499, in which the appellant paid attorney fees under compulsion of a trial court order requiring that they be paid within 30 days of the order assessing them. (*Id.* at p. 502.) While the record in this case does not include any evidence that the attorney fee awards were ordered to be paid by a date certain or that payment was made under threat of attachment or other means of collection, we need not resolve the waiver argument as, even if Raymond has not waived this contention, it fails as his appeal is otherwise unsuccessful and he makes no other argument to support his claim that the amounts awarded are not due as explained in the text accompanying this footnote.

made no other argument to suggest the awards should be overturned – and therefore waived any such contentions – we affirm these awards.

## **DISPOSITION**

The October 23, 2015 Order Settling the Trustee's First Account, filed October 29, 2014, is affirmed.  The Orders entered on January 7 and March 18, 2016, awarding attorney fees to Robert and Jenifer, and the Order entered on January 7, 2016, awarding attorney fees to Richard, are affirmed.  All other appeals are dismissed.

Richard, Robert and Jenifer shall each recover his or her attorney fees and costs on appeal from Raymond.


**CERTIFIED FOR PARTIAL PUBLICATION**




GOODMAN, J.*




We concur:




EDMON, P. J.            LAVIN, J.

---

*        Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.